UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re RETROPHIN, INC. Securities Litigation | : : : : : | Case No. 1:14-cv-08376-PKC <br><br> **CLASS ACTION** |
| This Document Relates To: <br><br> ALL ACTIONS | : : : : : : : | **DEMAND FOR JURY TRIAL** |

**FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF
THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Grachya Kazanchyan ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants Retrophin, Inc. ("Retrophin" or the "Company"), Martin Shkreli, Marc L. Panoff, Jeffrey Paley, Steve Richardson, Stephen Aselage, and Cornelius E. Golding (collectively, the "Defendants"), alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Retrophin, analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.    This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased the securities

of Retrophin from June 13, 2013 to September 30, 2014, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Defendant Retrophin, a biopharmaceutical company, focuses on the development, acquisition, and commercialization of therapies for the treatment of serious, catastrophic, or rare diseases. Retrophin was founded in 2011 by defendant Martin Shkrekli ("Shkreli"), a thirty-one year old former hedge fund manager-turned-biotech entrepreneur.

3.     Prior to starting Retrophin, Shkreli previously managed the hedge fund MSMB Capital Management ("MSMB"). Founded by Shkreli in 2009, MSMB specialized in healthcare investments. According to *Forbes*, he "is best known to investors as an activist who battled billionaires and entrenched drug industry executives through blog posts, shareholder letters, regulatory filings, and even an attempted hostile takeover."[1] His work at MSMB attempted to "reshape drug development from the outside," as *Forbes* explained:

> He is best known to biotech investors for a 2011 hostile takeover attempt of Amag Pharmaceuticals, done for the specific purpose of firing the company's management and stopping a proposed merger with Allos Therapeutics. When the merger plans stopped, so did Shkreli. He also filed a petition with the FDA arguing that an inhaled insulin from the Mannkind, the biotech firm run by billionaire Al Mann, should not be approved. It was not. At the time, he was short Mannkind shares. He publicly criticized Pfizer's decision to replace chief executive Jeffrey Kindler with Ian Read, arguing the company needed a fresh perspective.

> Citizens for Responsibility and Ethics In Washington ["CREW"], a Beltway group that targets special interests, has accused Shkreli of "trying to foist his medical views on the FDA."

---

[1] Matthew Herper, *30 Under 30: Hedge Fund Gadfly Turns Biotech Entrepreneur*, Forbes (Dec. 18, 2012), *at* http://www.forbes.com/sites/matthewherper/2012/12/18/30-under-30-hedge-fund-gadfly-turns-biotech-entrepreneur/.

4.      After Shkreli founded Retrophin in 2011, the Company went public in the U.S. on December 12, 2012 via a dubious reverse merger, the vehicle of choice for numerous fraud-ridden Chinese companies that eventually turned out to be worthless. In fact, in 2011 the SEC warned investors that "[m]any companies either fail or struggle to remain viable following a reverse merger. Also, as with other kinds of investments, there have been instances of fraud and other abuses involving reverse merger companies." The SEC also cautioned that "auditing firms might not identify circumstances where these companies may not be complying with the relevant accounting standards," which "can result in increased risks for investors."

5.      Defendants' SEC filings and other public statements issued during the Class Period were riddled with misstatements and omitted key facts that they had a duty to disclose under SEC regulations. Specifically, Defendants concealed from investors numerous stock trading irregularities and improper practices, including: (i) granting millions of shares of Retrophin stock to various Company employees and "consultants" without shareholder approval and in violation of NASDAQ Stock Market ("NASDAQ") regulations, (ii) entering into millions of dollars' worth of sham settlements and consulting agreements that were, in fact, related party transactions designed to personally benefit Shkreli, and (iii) facilitating Shkreli's breach of his fiduciary duties to stockholders by raising money for a new venture while still at Retrophin and allowing his new company to purchase one of Retrophin's pipeline drugs.

6.      These improper practices were orchestrated and directed by Shkreli, with the acquiescence of Retrophin management and the Board of Directors. Indeed, numerous red flags highlighted Shkreli's highly erratic and improper behavior and were known to the Individual Defendants—including woefully deficient internal controls that existed throughout the Class Period, knowledge that Shkreli's high ownership position could allow him to take positions

antagonistic to the Company, questionable related party transactions that directly benefitted Shkreli, the abrupt dismissal of the Company's independent auditor, an investigation into Shkreli by CREW in 2012 for his alleged attempts to manipulate stock prices, ongoing litigation highlighting Shkreli's bizarre behavior with employees, and numerous articles questioning Shkreli's disclosures to investors and potential insider selling.

7.     The truth was revealed through a series of partial corrective disclosures, beginning on September 13, 2013 with the Company's filing of an Amended Form 10-K for the year ended December 31, 2012, to include disclosures of certain settlement agreements entered into by Retrophin (which would later be revealed were related party transactions benefitting Shkreli). As a result of this news, shares of Retrophin fell $0.40, or over 5%, to close at $6.80 on the next trading day.

8.     On April 4, 2014, Retrophin unexpectedly announced the termination of its auditor, Marcum LLP. As a result of this news, shares of Retrophin fell $1.04, or over 5%, to close at $17.99 on the next trading day, April 7, 2014.

9.     Then, on September 16, 2014, the Company suddenly announced that its Chief Financial Officer, Defendant Panoff, and director Defendant Paley both had resigned. In response to this news, Retrophin stock fell $1.03, or over 8%, on unusually heavy trading volume, to close at $11.46 on September 17, 2014.

10.     On September 30, 2014, the Company disclosed that its Board of Directors terminated Chief Executive Officer Shkreli effective immediately, and appointed Stephen Aselage as interim Chief Executive Officer. This news caused an additional stock price drop of almost 4.5%, or $0.40 per share.

11.     On October 2, 2014, Bloomberg Businessweek published an article stating that Retrophin fired Shkreli because he engaged in stock-trading irregularities and other violations of securities rules. The article stated, in part:

> According to people familiar with the company, the board concluded that Shkreli had committed stock-trading irregularities and other violations of securities rules. The violations included grants of Retrophin stock to certain recipients in the absence of a shareholder-approved distribution plan, failures to disclose stock grants, and grants of stock above limits imposed by the plan that was eventually put in place, the people said. Shkreli has not returned phone messages seeking comment.

12.     Similarly, on October 6, 2014, an analyst at Seeking Alpha reported additional information regarding Shkreli's trades and summarized the suspicious circumstances surrounding Shkreli's departure from the Company, including his violations of the federal securities laws, illicit insider trading, and the dysfunctional state of the Company.

13.     On this news, Retrophin shares dropped $0.21 per share from $11.00 to $10.79, a drop of almost 2%, and continued to fall for several days thereafter. In total, Retrophin stock plunged 15% in the wake of these revelations, from $11.00 on October 6, 2014 to $9.34 on October 13, 2014.

14.     On January 23, 2015, the Company filed a proxy statement admitting to the stock grant violations—asking investors to ratify prior issuance of stock options that were granted without shareholder approval and in violation of NASDAQ listing rules. The Proxy asked shareholders to vote for "the ratification of the Company's prior issuance of stock options to purchase 1,928,000 shares of common stock and 230,000 restricted shares of common stock granted to employees between February 24, 2014 and August 18, 2014, as required pursuant to the Listing Rules of the [Nasdaq], in order to allow the Company to regain compliance with such Nasdaq Listing Rules." The Company only disclosed these equity awards to investors on October 3, 2014, calling them "inducement awards" which acted as an inducement material to persons

entering into employment with the Company. However, on December 9, 2014, NASDAQ informed Retrophin did not comply with the stockholder approval requirement of Listing Rule 5635(c) because these awards did not satisfy the requirements to qualify as "inducement awards." The Company was forced to submit the proposal to shareholders via the January 23rd Proxy to regain compliance with NASDAQ listing rules.

15.     Most recently, on February 20, 2015, the Company disclosed it had convened an Oversight Committee appointed by the Board of Directors to investigate stock irregularities surrounding Defendant Shkreli, that the resulting investigation confirmed the existence of inappropriate stock transactions issued without shareholder approval and in violation of Company policies and NASDAQ listing rules as well as the existence of sham agreements that were in fact millions of dollars' worth of improper related party transactions designed to personally benefit Defendant Shkreli, including consulting and settlement agreements that in fact released Shkreli from liabilities previously incurred at MSMB.

16.     As a result, the Company disclosed that its previously issued financial statements for the third quarter of 2013 and for the year ended December 31, 2013 could no longer be relied upon. That same day, the Company also confirmed that it is now under criminal investigation by the U.S. Attorney for the Eastern District of New York concerning its dealings with Defendant Shkreli and MSMB.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members suffered significant losses and damages.

**JURISDICTION AND VENUE**

18.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337, and § 27 of the Exchange Act (15 U.S.C. § 78aa).

20.     Venue is proper in this District pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

22.     Plaintiff, as set forth in the previously-filed Certification, which is incorporated by reference herein, purchased the securities of Retrophin at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

23.     Defendant Retrophin is a Delaware corporation based in New York, with executive offices located at 777 Third Avenue, 22nd Floor, New York, New York 10017. Its shares trade on the NASDAQ under the ticker symbol "RTRX." Retrophin transitioned into a publicly-traded company through a reverse merger with Desert Gateway, Inc. in December 2012.

24.     Defendant Martin Shkreli has served as the Company's founder and a member of the Board of Directors, and was at all relevant times until his termination on September 30, 2014, the Company's Chief Executive Officer ("CEO").

25.     Defendant Marc L. Panoff ("Panoff") served as the Company's Chief Financial Officer ("CFO") until the termination of his employment on September 15, 2014, effective as of February 28, 2015.

26.     Defendant Jeffrey Paley ("Paley") served as a member of the Board of Directors and the Company's Chief Medical Officer at all relevant times until his resignation on September 10, 2014.

27.     Defendant Steve Richardson ("Richardson") served on the Board of Directors since December 17, 2012 and served as chairman of the compensation and talent development committee at all relevant times.

28.     Defendant Stephen Aselage ("Aselage") served on the Board of Directors since December 17, 2012 and served as a member of the compensation and talent development committee at all relevant times.

29.     Defendant Cornelius E. Golding ("Golding") served on the Board of Directors since October 1, 2013 and served as a member of the compensation and talent development committee at all relevant times.

30.     Defendants referenced above in ¶¶ 24-29 are sometimes referred to herein collectively as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31.     Retrophin is a biotechnology company focused on discovering and developing treatments for rare and life-threatening diseases. Its primary objective is to develop and

commercialize therapies for so-called orphan diseases—developing treatments for rare but catastrophic diseases such as Focal Segmental Glomerulosclerosis, Pantothenate Kinase-Associated Neurodegeneration, and Duchenne Muscular Dystrophy. It sells Chenodal, a synthetic oral form of chenodeoxycholic acid for the treatment of radiolucent stones in gallbladders, and Vecamyl, for the treatment of hypertension. The Company also is developing Syntocinon Nasal Spray, an oxytocin nasal spray product for aiding milk let-down, as well as for the treatment of schizophrenia and autism; and RE-034, a synthetic hormone analogue for the treatment of infantile spasms and nephrotic syndrome. In addition, the Company intends to seek FDA approval of Chenodal for the treatment of cerebrotendinous xanthomatosis (a rare lipid storage disorder) and for the treatment of patients with biliary cirrhosis.

32.     The Company was founded by Defendant Shkreli in February 2011, and went public in the United States on December 12, 2012 via a reverse merger.

33.     During the Class Period, Defendants engaged in a series of undisclosed related party transactions that were designed to personally benefit Defendant Shkreli, omitted key facts about the transactions that had been disclosed, and issued over *two million* stock awards without the requisite shareholder approval.

<u>Defendants' Issuance of Significant<br>Stock Awards without Shareholder<br>Approval</u>

34.     Defendants granted millions of shares of Retrophin stock during the Class Period in the absence of a shareholder-approved distribution plan, failed to disclose the stock grants when they occurred, and granted stock above the limits imposed by the plan that was later put in place by the Company.

35.     On April 14, 2014, the Company filed a Definitive Proxy on Form 14A with the SEC (the "April 2014 Proxy Statement"), which attached as an exhibit Retrophin's 2014

Incentive Compensation Plan (the "Plan"). According to the April 2014 Proxy Statement, on March 20, 2014, the Board of Directors approved the Plan, which would be effective May 9, 2014, subject to stockholder approval at the 2014 annual meeting. The Plan covers stock options, stock appreciation rights, restricted stock and restricted stock units, deferred stock, performance units and annual incentive awards.

36.     The Plan also provides that the compensation and talent development committee of the Board of Directors (the "Compensation Committee") will administer the Plan, and individuals eligible for awards under the Plan are determined by the Compensation Committee in its discretion and are limited to the officers, employees and consultants of the Company and its subsidiaries and non-employee directors of the Company. The Plan specifies that the Compensation Committee has the *sole authority* to select the Plan's participants, make awards in such amounts and in such forms as it deems advisable, impose such restrictions, terms and conditions as it deems appropriate, or correct such technical defects or any inconsistencies in the Plan or any agreement made thereunder. The Plan, which terminates on May 9, 2024, was approved by shareholders on May 13, 2014.

37.     Moreover, according to the April 2014 Proxy Statement, the Company represented that the Compensation Committee's charter and compensation plan "complies with SEC rules and regulations and the NASDAQ listing standards."

38.     NASDAQ Marketplace Rule 4350(i)(1)(A) requires each issuer to obtain shareholders' approval of all equity compensation plans (including stock option plans) and *material amendments to such plans*. Specifically, this rule provides:

**(i) Shareholder Approval**

(1) Each issuer shall require shareholder approval or prior to the issuance of securities under subparagraph (A), (B), (C), or (D) below:

> (A) when a stock option or purchase plan is to be established or materially amended or other equity compensation arrangement made or materially amended, pursuant to which stock may be acquired by officers, directors, employees, or consultants.

39.     However, under NASDAQ Listing Rule 5635(c)(4), stockholder approval is not required for so-called "inducement awards," so long as such awards meet the requirements to qualify as inducements. Specifically, under that rule, "shareholder approval is not required of an issuance to a person not previously an employee or director of the company, or following a bonafide period of non-employment, as an inducement material to the individual's entering into employment with the company, provided that such an issuance is approved by the company's compensation committee or a majority of the company's independent directors."

40.     In violation of the compensation plan, Defendants surreptitiously granted millions of stock awards to various recipients without shareholder approval. Shareholders had no idea these awards were made until September 30, 2014, when the Company disclosed that its Board of Directors had terminated Defendant Shkreli, effective immediately, and appointed Stephen Aselage as interim Chief Executive Officer. Various news sources, including Bloomberg and Seeking Alpha, reported in the days that followed that Shkreli's termination had been prompted by various stock irregularities, including the improper grant of stock awards.

41.     A few days after Shkreli's termination, on October 3, 2014, the Company hastily issued a press release stating that it had, in fact, issued stock awards to 66 employees, but claimed that they were purported "inducement awards" (and therefore exempt from shareholder approval):

Retrophin Reports Inducement Grants under NASDAQ Listing Rule 5635(c)(4)

NEW YORK -- (BUSINESS WIRE) -- Retrophin, Inc. (NASDAQ: RTRX) today announced the grant of inducement awards to 66 employees, as well as the grant of an inducement award to Alvin Shih, M.D., the Company's Executive Vice President of Research and Development. The awards were granted as an

inducement material to each such employee's entering into employment with Retrophin pursuant to Rule 5635(b)(4) of the NASDAQ Listing Rules. 66 employees were granted inducement awards consisting of stock options to purchase an aggregate of 2,014,500 shares of Retrophin common stock and 200,000 shares of restricted common stock, and Dr. Shih was granted an inducement award consisting of 230,000 shares of restricted common stock. The stock options and restricted common stock generally vest in equal quarterly installments over a period of three years. The stock options are nonstatutory stock options and have an exercise price equal to the fair market value of Retrophin's common stock on their grant date.

42.    However, these awards did not meet the requirements for "inducement awards" and thus were improperly issued. The Company disclosed on December 15, 2014, that NASDAQ had reviewed these purported inducement awards and advised the Company in a December 9, 2014 letter that they did not satisfy the criteria to be considered inducement awards exempt from shareholder approval. Accordingly, the Company had to convene a shareholder vote in order to ratify all of these share grants after the fact:

On December 9, 2014, Retrophin, Inc. (the "*Company*") received a letter from The Nasdaq Stock Market LLC ("*Nasdaq*") indicating that Nasdaq has determined that the Company has failed to comply with the shareholder approval requirement of Nasdaq Listing Rule 5635(c), related to the Company's grant of stock options and restricted stock to employees from February 24, 2014 through August 18, 2014 (the "*Equity Awards*"). The Equity Awards were previously disclosed by the Company as inducement awards in a press release dated October 3, 2014. Upon review of the Equity Awards, Nasdaq has determined that the Equity Awards did not satisfy all of the criteria to qualify as inducement awards. Under applicable Nasdaq rules, the Company has 45 calendar days to submit a plan to regain compliance with all of the Nasdaq listing requirements. The Company has been in contact with Nasdaq since its receipt of the letter and has developed a plan to regain compliance, which it intends to submit to Nasdaq promptly. If the plan is accepted, Nasdaq can grant the Company an extension of up to 180 calendar days from December 9, 2014 to evidence compliance.

43.    NASDAQ Listing Rule 5635(c) states in pertinent part:

**(c) Equity Compensation**

Shareholder approval is required prior to the issuance of securities when a stock option or purchase plan is to be established or materially amended or other equity compensation arrangement made or materially amended, pursuant to which stock may be acquired by officers, directors, employees, or consultants, except for…

(4) issuances to a person not previously an employee or director of the Company, or following a bona fide period of non-employment, as an inducement material to the individual's entering into employment with the Company, provided such issuances are approved by either the Company's independent compensation committee or a majority of the Company's Independent Directors. Promptly following an issuance of any employment inducement grant in reliance on this exception, a Company must disclose in a press release the material terms of the grant, including the recipient(s) of the grant and the number of shares involved.

According to NASDAQ, the inducement exemption only applies to issuances to induce someone to enter into employment, and thus is not available to induce someone to become a consultant to the company and is not available to current employees of the company.[2]

44.     Because Defendants issued equity awards to current employees and consultants of the Company, those awards clearly did not qualify as "inducement awards" under NASDAQ guidelines, and shareholder approval of those awards was required.

45.     Moreover, the Company has admitted that, between February 24, 2014 and August 18, 2014, Defendants issued to Retrophin employees stock options to purchase 1,928,000 shares of the Company's common stock (the "Options") and 230,000 shares of restricted common stock (the "Restricted Stock" and together with the Options, the "Equity Awards") without stockholder approval. A detailed description of each Equity Award is set forth at Exhibit A hereto.

46.     The issuance of these shares thus violated the Company's own compensation and talent development charter, NASDAQ listing requirements with respect to shareholder approval of incentive compensation awards and director independence, and rendered the Company's SEC filings materially false and misleading.

---

[2] NASDAQ Listing Center, *Frequently Asked Questions: Shareholder Approval; Equity Compensation – Exceptions*, https://listingcenter.nasdaq.com/Material_Search.aspx?cid=71&mcd=LQ&sub_cid=114,97,109,101,103 (visited March 2, 2015).

### Undisclosed Related Party
### Transactions

47.     Defendants also failed to disclose related party transactions, and omitted highly material facts concerning disclosed related party transactions that occurred during the Class Period.

48.     Item 404 of Regulation S-K (17 C.F.R. § 229.404), Transactions with Related Persons, Promoters and Certain Control Persons, states in part:

(a) Transactions with related persons. Describe any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest. Disclose the following information regarding the transaction:

(1) The name of the related person and the basis on which the person is a related person.

(2) The related person's interest in the transaction with the registrant, including the related person's position(s) or relationship(s) with, or ownership in, a firm, corporation, or other entity that is a party to, or has an interest in, the transaction.

(3) The approximate dollar value of the amount involved in the transaction.

(4) The approximate dollar value of the amount of the related person's interest in the transaction, which shall be computed without regard to the amount of profit or loss.

(5) In the case of indebtedness, disclosure of the amount involved in the transaction shall include the largest aggregate amount of principal outstanding during the period for which disclosure is provided, the amount thereof outstanding as of the latest practicable date, the amount of principal paid during the periods for which disclosure is provided, the amount of interest paid during the period for which disclosure is provided, and the rate or amount of interest payable on the indebtedness.

(6) Any other information regarding the transaction or the related person in the context of the transaction that is material to investors in light of the circumstances of the particular transaction.

*** 

14

(d) Smaller reporting companies. A registrant that qualifies as a "smaller reporting company," as defined by § 229.10(f)(1), must provide the following information in order to comply with this Item:

> (1) The information required by paragraph (a) of this Item for the period specified there for a transaction in which the amount involved exceeds the lesser of $120,000 or one percent of the average of the smaller reporting company's total assets at year end for the last two completed fiscal years;

> (2) The information required by paragraph (c) of this Item; and

> (3) A list of all parents of the smaller reporting company showing the basis of control and as to each parent, the percentage of voting securities owned or other basis of control by its immediate parent, if any.

49.     Moreover, under Item 303 of Regulation S-K, Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") must "provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations." Specifically, "where related party transactions are material, MD&A should include discussion of those transactions to the extent necessary for an understanding of the company's current and prospective financial position and operating results."

50.     According to its SEC filings, Retrophin qualifies as a "smaller reporting company." Thus, based on its average reported assets for the past two years, the Company was required to disclose any related party transaction in excess of $114,000.

51.     In violation of these disclosure requirements, Defendants omitted from their SEC filings millions of dollars' worth of improper related party transactions that were designed to personally benefit Defendant Shkreli. In a Form 8-K filed on February 20, 2015 (the "February 20th Form 8-K"), Defendants disclosed the details of all of these improper arrangements. Specifically:

- Sham Consulting Agreements. Retrophin disguised legal settlements with former investors as "consulting agreements." Between September 2013 and March 2014, the

Company entered into several purported "consulting" agreements and releases with individuals or entities that had been investors in investment funds previously managed by Defendant Shkreli (*i.e.*, MSMB), or that otherwise had financial dealings with him. The agreements provided for the issuance of a total of 612,500 shares of common stock of the Company, and a total of $400,000 in cash payments by the Company. In fact, the real purpose of these agreements was to settle and release claims against MSMB or Shkreli personally, and not to provide meaningful and sustained consulting services to the Company.

- Settlement Agreements. A settlement agreement that had been previously disclosed, and pursuant to which the Company paid $300,000 in cash was, in fact, another related party transaction, because it was made with a former investor in MSMB, and the true purpose of this payment was to settle and release the investor's claims against MSMB and Defendant Shkreli personally. In addition, Shkreli delivered an additional 80,000 shares of common stock of the Company to another former investor in MSMB pursuant to a previously undisclosed settlement agreement to which the Company was a party.

- Litigation Settlements. In the second quarter of 2014, the Company settled two lawsuits involving individuals who had formerly performed services for both the Company and MSMB. Approximately $200,000 in cash payments made by the Company as part of these settlements were made to pay individuals to transfer 176,388 shares of Retrophin common stock directly to Defendant Shkreli.

- Other Obligations. During the quarter ended March 31, 2013, the Company repaid a $900,000 secured promissory note dated February 1, 2012, together with interest thereon, in favor of MSMB. The Oversight Committee concluded that MSMB originally transferred the $900,000 to the Company as an equity investment, which was subsequently reclassified as a loan. $900,000 of the Company's payment against the note, together with a $575,000 payment made by the Company to Shkreli (which appears to have been a discretionary bonus), was, in fact, a payment to settle an arbitration proceeding brought against MSMB and Shkreli personally. The Company also paid or forgave monetary obligations of approximately $1.2 million of other obligations for the primary benefit of MSMB, which were not disclosed.

52.    In the February 20th Form 8-K, the Company also stated that, as a result of some

of these transactions, investors could no longer rely on the previously issued 2013 third quarter

Form 10-Q and 2013 Form 10-K:

**Impact on Financial Statements**

The financial statements contained in the Company's Form 10-Q for the three months ended September 30, 2013 (the "2013 Q3 Form 10-Q"), the Company's Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K") and the Company's Forms 10-Q for the quarters ended March

31, 2014, June 30, 2014 and September 30, 2014 (the "2014 Forms 10-Q") contain errors related to certain of the consulting agreements described above, the predominant purpose of which appears to have been to settle and release claims against the MSMB Entities or Mr. Shkreli personally.

Specifically, the Company previously recognized expense related to the stock issued pursuant to such consulting agreements over the term of each such agreement. Had the Company accounted for these arrangements as settlements, the Company would have recorded, as of the date of each such agreement, an expense and a settlement liability related to the entire amount of the stock to be issued under such agreement. The settlement liability would have been revalued at each reporting period based on changes in the Company's stock price until the stock had been entirely issued.

On February 19, 2015, the Board concluded that as a result of the errors related to such consulting agreements, the financial statements contained in the 2013 Q3 Form 10-Q and the 2013 Form 10-K should no longer be relied upon. The Company's authorized officers have discussed such matters with Marcum LLP. The Company will correct such errors, including any related disclosures, in the Company's Form 10-K for the year ended December 31, 2014 (the "2014 Form 10-K").

The Company believes that the errors related to such consulting agreements in the 2014 Forms 10-Q do not cause the financial statements contained therein to be misleading, and therefore such financial statements can still be relied upon. The Company will correct such errors, including any related disclosures, in the 2014 Form 10-K.

### Defendant Shkreli's Securities Laws Violations and Breaches of Fiduciary Duty

53.     Prior to starting Retrophin, Shkreli worked at several hedge funds specializing in the healthcare industry, most notably owning and running MSMB. Shkreli is no stranger to stock trading scandals. In fact, he has been investigated by CREW for allegedly attempting to manipulate stock prices.

54.     During the Class Period, Shkreli engaged in egregious self-dealing at Retrophin—selling almost $15 million in Retrophin stock while in the possession of the material, adverse, inside, non-public information described herein. After Retrophin's stock price swelled in value from approximately $6 per share at the beginning of the Class Period to $14.62 on May 30, 2014,

17

Shkreli unloaded 292,400 shares onto the open market, earning him almost $4.5 million in illicit insider trading gains at the expense of investors. This trade occurred just after Shkreli posted suspicious messages on the internet and the Company released uber-bullish "non-non-non-GAAP guidance" to investors on May 29th, and just prior to the Company's release of news that it had obtained a license agreement for its product Thiboloa. This trade also occurred weeks after shareholders approved Retrophin's 2014 Incentive Compensation Plan—which Defendant Shkreli had direct knowledge had been violated prior to the vote, and which he would continue to later violate with non-approved incentive compensation awards.

55.     Moreover, after his termination as CEO, but while still in the possession of material insider information, Shkreli continued to unload Retrophin stock on the market. Between November 14, 2014 and November 21, 2014, Shkreli sold 1.17 million shares for over $10 million in illicit profits. In fact, the very next month, on December 15, 2014, the Company announced that NASDAQ determined that it was out of compliance with listing requirements related to Defendants' issuance of stock to employees without shareholder approval—which Shkreli unequivocally knew at that time, but which was unknown to the investing public.

56.     Not only did Shkreli engage in a massive insider trading scheme, but also he breached his fiduciary duties to Retrophin stockholders by engaging in self-dealing and usurping corporate opportunities.

57.     While still acting as CEO of Retrophin, Defendant Shkreli raised money from investors to divert to his newest venture, privately-owned Turing Pharmaceuticals ("Turing"). Shkreli is now Chief Executive Officer of Turing, and has been in that position since October 2014 according to his LinkedIn profile, only one month after he left Retrophin. In fact, several former employees of Retrophin now work for Turing.

58.     Moreover, Shkreli used the funds raised during his tenure at Retrophin for Turing to purchase rights from Retrophin to market several drugs in its pipeline—a direct conflict of interest with his duties to Retrophin stockholders and usurping a corporate opportunity from Retrophin. Specifically, in a Form 8-K filed with the SEC on February 15, 2015, the Company disclosed:

> On February 13, 2015, Retrophin, Inc. (the "Company"), its wholly-owned subsidiary Manchester Pharmaceuticals LLC ("Manchester"), and its other wholly-owned subsidiary Retrophin Therapeutics International, LLC (collectively, the "Sellers"), entered into a Purchase Agreement with Waldun Pharmaceuticals, LLC ("Waldun"), pursuant to which the Sellers sold Waldun their product rights to mecamylamine hydrochloride (also referred to as Vecamyl) (the "Vecamyl Product Rights") for a purchase price of $700,000. Waldun in turn sold the Vecamyl Product Rights to Turing Pharmaceuticals AG ("Turing Pharmaceuticals"). In connection therewith, on February 13, 2015, the Company and Manchester entered into an Asset Purchase Agreement with Turing Pharmaceuticals, pursuant to which the Company and Manchester sold Turing Pharmaceuticals their mecamylamine hydrochloride inventory (the "Inventory") for a purchase price of $300,000. Turing Pharmaceuticals will also assume certain liabilities related to the Vecamyl Product Rights and the Inventory.

> Additionally, on February 13, 2015, the Company entered into an Asset Purchase Agreement with Turing Pharmaceuticals pursuant to which the Company sold Turing Pharmaceuticals its syntocinon (also referred to as oxytocin) licenses and assets (the "Oxytocin Assets"), including related inventory, for a purchase price of $1,110,931.20. Turing Pharmaceuticals will also assume certain liabilities related to the Oxytocin Assets.

> Martin Shkreli, the Company's former Chief Executive Officer, is the Chief Executive Officer of Turing Pharmaceuticals.

59.     Confidential witness 1 ("CW1") was a director of research at Retrophin from February 2014 until October 2014 and reported to the Company's Chief Science Officer. CW1 recalled that Shkreli "got a number of warnings by the Board to improve his behavior," including a scolding for Shkreli's Twitter posts in May and June 2014. "He was tweeting these things, ruffling the feathers of a lot of board members by his behavior," CW1 said. "They told him to knock it off several times." Moreover, CW1 indicated that Shkreli showed a disregard for the

Board and their concerns at a companywide meeting. "He was coming off like it didn't matter what they had to say, he didn't need to hold himself accountable to them," CW1 said. "His attitude was like it's his company not theirs." According to CW1, "[h]e made it seem like it was no big deal, and that he was going to continue to do what he wanted to do." CW1 said that the Board ousted Shkreli for stock grants that were not approved and for breaking into the Company's email system, during which he deleted emails, threatened employees and tried to recruit employees away from Retrophin to join his new company.

<u>**The Individual Defendants Ignored**</u>
<u>**Blatant Red Flags of Potential Fraud**</u>

60.     Numerous red flags existed that alerted the Individual Defendants, absent severe recklessness, to the falsity of the Company's public statements during the Class Period: woefully deficient internal controls that existed throughout the Class Period, knowledge that Shkreli's high ownership position could allow him to take positions antagonistic to the Company, Defendants' knowledge and approval of questionable related party transactions that directly benefitted Shkreli, dismissal of the Company's independent auditor, an investigation into Shkreli by CREW in 2012 for his alleged attempts to manipulate stock prices, ongoing litigation that highlighted Shkreli's bizarre behavior with employees, numerous articles questioning Shkreli's disclosures to investors and potential insider selling, and prior restatements to the Company's financial results.

*Retrophin's Woefully Deficient Internal Controls*

61.     The improper practices alleged herein were facilitated by the Company's utter lack of internal controls.

62.     In fact, the Company was plagued by material internal control deficiencies from the outset—a fact that was well known to the Individual Defendants. The Company's November

15, 2013 Form S-1 Registration Statement filed with the SEC disclosed that, "[i]n connection with the preparation of our audited financial statements for the period from March 11, 2011 (inception) through December 31, 2011 and the year ended December 31, 2012, our independent auditors advised management that a material weakness existed in internal control over financial reporting and our disclosure controls."

63.     Then, on May 15, 2014, in its Form 10-Q filed with the SEC for the period ended March 31, 2014, the Company clarified the material weaknesses: "[O]ur disclosure controls are not effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported, within the time periods specified in the SEC rules and forms and (ii) is accumulated and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, as appropriate to allow timely decisions regarding required disclosure." Moreover, the Company disclosed that it "identified certain matters that constituted material weaknesses in our internal controls over financial reporting, specific material weaknesses include the fact that we (i) have experienced difficulty in generating data in a form and format that facilitates the timely analysis of information needed to produce accurate financial reports, (ii) have experienced difficulty in applying complex accounting and financial reporting and disclosure rules required under GAAP and the SEC reporting regulations, and (iii) have limited segregation of duties."

64.     On August 14, 2014, the Company filed a Form 10-Q for the period ended June 30, 2014, which disclosed that the Company "concluded that as of the Evaluation Date, our disclosure controls are not effective to ensure that information required to be disclosed by us in reports that we file or submit under the Exchange Act (i) is recorded, processed, summarized and reported, within the time periods specified in the SEC rules and forms and (ii) is accumulated

and communicated to our management, including our Principal Executive Officer and Principal Financial Officer, as appropriate to allow timely decisions regarding required disclosure." The Company also "identified certain matters that constituted material weaknesses in our internal controls over financial reporting, specific material weaknesses include the fact that we (i) have experienced difficulty in generating data in a form and format that facilitates the timely analysis of information needed to produce accurate financial reports, (ii) have experienced difficulty in applying complex accounting and financial reporting and disclosure rules required under GAAP and the SEC reporting regulations, and (iii) have limited segregation of duties."

### *Defendant Shkreli's Powerful Ownership Position*

65.     Defendants acknowledged in a January 7, 2014 Registration Statement that Defendant Shkreli could take a position antagonistic to shareholders due to his large Company stock holdings:

> Martin Shkreli, our Chief Executive Officer and one or our directors, is our largest stockholder. Together with other entities that he controls, Mr. Shkreli beneficially owns 3,445,615 shares of our common stock, or approximately 19% of our outstanding common stock. If he were to choose to act with other large stockholders, they would be able to control all matters submitted to our stockholders for approval, as well as our management and affairs. For example, these persons, if they choose to act together, will control the election of directors and approval of any merger, consolidation, sale of all or substantially all of our assets or other business combination or reorganization. This concentration of voting power could delay or prevent an acquisition of us on terms that other stockholders may desire. The interests of this group of stockholders may not always coincide with your interests or the interests of other stockholders, and they may act, whether by meeting or written consent of stockholders, in a manner that advances their best interests and not necessarily those of other stockholders, including obtaining a premium value for their common stock, and might affect the prevailing market price for our common stock.

### *News Sources Questioned Potential Problems at Retrophin*

66.     In addition, Defendants were aware of and approved questionable related party transactions that directly benefitted Defendant Shkreli. These transactions were highlighted in

the May 28, 2014 Seeking Alpha article, which noted, among other things, that "approximately $3 million of Retrophin shareholder money was used to settle and extinguish legal liabilities of MSMB Capital (and indirectly the CEO). How can this possibly benefit Retrophin shareholders (other than the CEO)?"

67.    Thus, given their knowledge of these related party transactions, the Individual Defendants were well aware of Shkreli's propensity to use Retrophin as his personal piggy bank to settle his other legal liabilities, and knew, or recklessly disregarded, the existence of other additional, undisclosed related party agreements.

68.    In addition, as highlighted in the May 28th Seeking Alpha article, the Individual Defendants were aware that numerous "unnamed consultants" received large amounts of Retrophin stock. The article stated:

> Retrophin gave hundreds of thousands of shares of Company stock to certain unnamed and presumably part-time "consultants," thereby diluting its shareholders. For example, one such consultant received 200,000 shares of stock in March 2014 (valued at $3.75 million on the date of issuance). Who are these consultants, what are they doing on behalf of the company and why is their identity not revealed? See p. 64 of the 2013 10K for details.

69.    Further, news reports raised numerous additional red flags regarding Retrophin during the Class Period, including:

a.    The May 28th Seeking Alpha Article noted that the predecessor to Retrophin, Desert Gateway, Inc., was controlled by an entity owned by Ruth Shepley, who reportedly was instrumental in creating various shell companies in the U.S. that were later implicated in Chinese reverse merger frauds (*i.e.*, Telestone Technologies Corp., China Bio-Energy Corp., and CH Lighting International); and

b.    A May 30, 2014 Bloomberg article detailed suspicious Twitter posts by Shkreli just prior to the Company releasing news that it entered into a licensing agreement for one of its drugs, Thiboloa. That same day, Shkreli unloaded 292,400 shares onto the open market, earning him almost $4.5 million in proceeds.

***Retrophin Fires Its Independent Auditor***

70.     On March 31, 2014, the Audit Committee of the Board notified the Company's independent registered accounting firm, Marcum LLP ("Marcum"), that it had determined not to engage Marcum for the fiscal year ending December 31, 2014.

71.     On February 20, 2015, the Company filed a Form 8-K with the SEC revealing that its previously-filed financial statements contained errors with respect to the related party transactions and that it had discussed those matters with Marcum:

> On February 19, 2015, the Board concluded that as a result of the errors related to such consulting agreements, the financial statements contained in the 2013 Q3 Form 10-Q and the 2013 Form 10-K should no longer be relied upon. The Company's authorized officers have discussed such matters with Marcum LLP. The Company will correct such errors, including any related disclosures, in the Company's Form 10-K for the year ended December 31, 2014 (the *"2014 Form 10-K"*).

72.     Marcum's dismissal and subsequent consultation represent substantial evidence that the issues that led to the upcoming restatements had been flagged by the Company's independent auditors nearly a year before this announcement.

### Prior Investigation of Shkreli for Stock Manipulation

73.     Defendants also knew that Shkreli had been investigated by CREW in 2012 for allegedly attempting to manipulate stock prices. In 2012, CREW claimed Shkreli made postings on Seeking Alpha that spread "unfounded and inaccurate rumors about drugs owned by companies he was shorting," and that he "inserted himself" into the Food and Drug Administration ("FDA") approval process for pending pharmaceuticals. CREW called upon the SEC to investigate Shkreli, alleging that "[m]ounting evidence suggests Wall Street investors are inserting themselves into the FDA drug approval process to manipulate stock prices for financial gain. Thoroughly researching companies before making investment decisions is smart; intentionally making false claims to a federal agency to drive down stock prices is illegal." CREW also called upon the U.S. Attorney for the Southern District of New York to investigate

Shkreli's short-selling activities to determine whether he illegally manipulated stock prices in the biotechnology and pharmaceutical industries.

### Red Flags Emerge from Ongoing Litigation

74.     Moreover, the Company and Defendant Shkreli were involved in litigation that raised additional red flags concerning Shkreli's highly erratic and questionable behavior. These facts were known to the Individual Defendants.

75.     On March 23, 2013, Chun Yi Huang filed a complaint in New York state court against Retrophin and Shkreli for breach of contract related to his employment agreement and various related labor law violations. According to the complaint, in May 2012, Huang was hired as Retrophin's Managing Director and was quickly promoted to Senior Vice President of Scientific Affairs, but was forced to resign from his post in December 2012 after the Company failed to pay his salary and other benefits promised to him for a three month period.

76.     On May 15, 2013, Retrophin filed suit against Timothy Pierotti in New York state court, claiming that the Company "facilitated [Pierotti's] acquisition of [350,000 Retrophin] shares of common stock at a deeply discounted price ($0.001 per share, as compared to the current market price which has ranged between $8.00 and $8.80 per share) based on [Pierotti's] express promise to work to build and develop" the Company by "identifying revenue-generating acquisition targets." Retrophin seeks to recover the 350,000 shares, which were then "worth at least $3,000,000, which is least 7,000 times more than what [Pierotti] paid for them, *i.e.*, $400." According to Pierotti, Shkreli threatened him and his family members over a period of months and breached Pierotti's personal online accounts.

### Restatements Necessitated During the Class Period

77.     Finally, the Company was forced to restate its financial statements for the year ended December 31, 2013 on September 13, 2013 by filing an amended Form 10-K/A with the SEC, stating in part:

> The Company, while undergoing a review of its condensed consolidated financial statements for the three and six months periods ended June 30, 2013, commenced an evaluation of its accounting for a series of settlement agreements that the Company, along with certain of its related parties, entered into between April 2013 and June 2013. These agreements, which Company management originally deemed to be the primary obligation of a related party, are more fully described in Notes 2 and 12. On September 13, 2013, Company management, under the authority of the board of directors, determined that these agreements should have been disclosed in the footnotes to its consolidated financial statements for the year ended December 31, 2012. Accordingly, the Company has restated the consolidated financial statements to include these disclosures.

> The Company also determined that its obligation to pay liquidated damages under a registration payment that it entered into in connection with a financing transaction completed on February 14, 2013, which required the Company to cause a registration statement to be declared effective by the Securities and Exchange Commission by May 15, 2013, should have also been disclosed. Accordingly, the Company is restating these consolidated financial statements to disclose that it allocated approximately $360,000 of the proceeds received in this financing transaction to a registration payment obligation that was deemed probable at the date that the financing transaction was completed.

78.     This early restatement should have forced Defendants to pay close attention to financial disclosures, especially with respect to related party transactions, made to investors later in the Class Period.

79.     Despite the presence of these red flags highlighting Defendant Shkreli's improper behavior, Defendants knew or recklessly ignored that significant stock awards were issued without shareholder approval, the Company engaged in undisclosed related-party transactions directly benefitting Shkreli, facilitated Shkreli's breach of his fiduciary duties to stockholders by raising money for a new venture while still at Retrophin and allowing his new company to purchase one of Retrophin's pipeline drugs, and ignoring Shkreli's suspicious insider trading scheme.

**Materially False and Misleading
Statements Issued During the Period**

80.     On June 13, 2013, the Company filed an annual report on Form 10-K with the

SEC which was signed by the Individual Defendants, and disclosed the Company's year-end

2012 annual financial results and financial position. In addition, the Form 10-K contained

certifications signed pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Shkreli

and Panoff, stating that the financial information contained in the Form 10-K was accurate and

disclosed any material changes to the Company's internal control over financial reporting.

81.     Specifically, the SOX certification stated as follows:

I, Martin Shkreli, certify that:

1.              I have reviewed this Transition Report on Form 10-K of
                Retrophin, Inc. (f/k/a Desert Gateway, Inc.);

2.              Based on my knowledge, this report does not contain any untrue
                statement of a material fact or omit to state a material fact
                necessary to make the statements made, in light of the
                circumstances under which such statements were made, not
                misleading with respect to the period covered by this report;

3.              Based on my knowledge, the financial statements and other
                financial information included in this report, fairly present in all
                material respects the financial condition, results of operations
                and cash flows of the registrant as of, and for, the periods
                presented in this report;

4.              The registrant's other certifying officer(s) and I are responsible
                for establishing and maintaining disclosure controls and
                procedures (as defined in Exchange Act Rules 13a-15(e) and
                15d-15(e)) and internal control over financial reporting (as
                defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the
                registrant and have:

                (a)             Designed such disclosure controls and
                                procedures, or caused such disclosure controls
                                and procedures to be designed under our
                                supervision, to ensure that material
                                information relating to the registrant, including
                                its consolidated subsidiaries, is made known to

27

us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financing reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who

have a significant role in the registrant's
internal control over financial reporting.

The Company's Form 10-K also included a substantially similar SOX certification, signed by

CFO Panoff.

82.     The Form 10-K contained a section entitled "Management's Discussion and

Analysis of Financial Condition and Results of Operations," which summarized key factors

management believed necessary for an understanding of the Company's financial statements.

The discussion included an in-depth analysis of the Company's financial condition, stating in

part:

> For the period March 11, 2011 (inception) through December 31, 2012
>
> Operating expenses were approximately $33.52 million during the period from
> March 11, 2011 through December 31, 2012. The largest factors impacting our
> operating expenses during the period related compensation and related costs of
> approximately $20.36 million and $9.94 million in professional fees which
> included stock base compensation of approximately $24.39 million, consisting of
> approximately 2,479,000 shares of vested incentive shares granted to members
> and employees amounting to approximately $17.74 million and approximately
> 254,000 shares of vested incentive shares granted to consultants and direct
> transfers of shares to consultants by members amounting to approximately $6.65
> million for services rendered. Operating expenses also included rent expenses of
> approximately $0.16 million, depreciation and amortization expenses of
> approximately $0.13 million, license fee of approximately $1.70 million, bad debt
> expense of $0.56 million and travel and entertainment, other expenses and
> advertising fees of approximately $0.67 million.
>
> *Other Operating Expenses*
>
> Other operating expenses for the period March 11, 2011 (inception) through
> December 31, 2011, for the year ended December 31, 2012, and for the period
> March 11, 2011 (inception) through December 31, 2012 were as follows: (i)
> approximately $0.005 million,$0.003 and $0.008 million, respectively which is
> related to a loss in foreign exchange in a vendor payment, (ii) approximately zero,
> $0.022 million and $0.022 million, respectively which related to $.2 million note
> receivable with an interest rate of 12% per annum offset by approximately zero,
> $0.106 million and $0.106 million respectively of interest expense relate to a
> $0.900 million and $0.030 note payable with an interest rate of 12% and 15%,
> respectively, per annum.

*\*\**

*Off-Balance Sheet Arrangements*

We do not have any off-balance sheet arrangements.

83.     The statements referenced in ¶¶ 80-82 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them: (i) the Company's financial statements and other SEC filings were materially false and/or misleading at all relevant times; and (ii) Defendants engaged in, but did not disclose, numerous related party transactions including settlement agreements involving related parties that were entered into between April 2013 and June 2013; and during the first quarter of 2013, Retrophin paid a $900,000 promissory note in favor of MSMB and forgave other monetary obligations of approximately $1.2 million for the benefit of MSMB and Shkreli. As explained in the Company's Form 10-K/A filed on September 13, 2013:

*Restatement of Previously Issued Financial Statements for Additional Disclosures*

The Company, while undergoing a review of its condensed consolidated financial statements for the three and six months periods ended June 30, 2013, commenced an evaluation of its accounting for a series of settlement agreements that the Company, along with certain of its related parties, entered into between April 2013 and June 2013. These agreements, which Company management originally deemed to be the primary obligation of a related party, are more fully described in Notes 2 and 12. *On September 13, 2013, Company management, under the authority of the board of directors, determined that these agreements should have been disclosed in the footnotes to its consolidated financial statements for the year ended December 31, 2012. Accordingly, the Company has restated the consolidated financial statements to include these disclosures.*

The Company also determined that its obligation to pay liquidated damages under a registration payment that it entered into in connection with a financing transaction completed on February 14, 2013, which required the Company to cause a registration statement to be declared effective by the Securities and Exchange Commission by May 15, 2013, should have also been disclosed. Accordingly, the Company is restating these consolidated financial statements to disclose that it allocated approximately $360,000 of the proceeds received in this

financing transaction to a registration payment obligation that was deemed probable at the date that the financing transaction was completed.

(Emphasis supplied.)

84. On July 24, 2013, the Company filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Shkreli and Panoff and disclosed the Company's first quarter 2013 financial results and financial position. In addition, the Form 10-Q contained certifications signed pursuant to SOX by Defendants Shkreli and Panoff, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications included in the Company's Form 10-Q were substantially similar to those described in ¶ 81.

85. The Form 10-Q contained a MD&A section which reviewed significant factors affecting the Company's financial condition and results of operations. With respect to the Company's operating expenses, Defendants failed to disclose the relevant related party transactions which they later admitted would need to be restated:

**Results of Operations for the Three Month Period Ended March 31, 2013 compared to the Three Month Period Ended March 31, 2012**

*Operating Expenses*

We had no revenues during the three month period ended March 31, 2013 and 2012. Our operating expenses for the three month period ended March 31, 2013 were $2,250,484 compared to $3,558,454 for the three month period ended March 31, 2012. Our operating expenses for the three month period ended March 31, 2013 consisted of (i) compensation and related costs of approximately $1,045,287 which included (a) approximately $1,024,454 in salaries, bonuses and benefits to Company executives and employees and (b) approximately 5,556 shares of vested incentive shares granted to members and employees amounting to approximately $20,833, (ii) professional fees of approximately $692,577 which included (a) approximately 42,374 shares of vested incentive shares granted to consultants and direct transfers of shares to consultants by members amounting to approximately $138,372 for services rendered; (b) research and development fees of approximately $108,735 related to Retrophin's drug (RE-021 and RE-024) candidates for the treatment of FSGS and PKAN and evaluation of potential new technologies; (c) legal expense of approximately $138,243 related to licensing

and production acquisition, employment and consulting agreements and general corporate work; (d) consulting fees of approximately $97,893 related to outsourcing management roles; (e) accounting fees of approximately $125,254 related to general accounting and audit work and (f) $84,075 in fees related to public and investor relations, (iii) rent expense of approximately $35,112, (iv) license fees of approximately $100,000, (v) depreciation and amortization expense of approximately $52,168 related to the Ligand licensing agreement and (vi) the remaining balance of $325,340 is related to travel and entertainment, business developments, advertising and other operating expenses.

86.     The statements referenced in ¶¶ 84-85 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company's financial statements and other SEC filings were materially false and/or misleading at all relevant times; and (ii) Defendants engaged in, but did not disclose, numerous related party transactions including, during the first quarter of 2013, Retrophin paid a $900,000 promissory note in favor of MSMB and forgave other monetary obligations of approximately $1.2 million for the benefit of MSMB and Shkreli. As explained in the Company's Form 10-K/A filed on September 13, 2013:

> *Restatement of Previously Issued Financial Statements for Additional Disclosures*
>
> The Company, while undergoing a review of its condensed consolidated financial statements for the three and six months periods ended June 30, 2013, commenced an evaluation of its accounting for a series of settlement agreements that the Company, along with certain of its related parties, entered into between April 2013 and June 2013. These agreements, which Company management originally deemed to be the primary obligation of a related party, are more fully described in Notes 2 and 12. *On September 13, 2013, Company management, under the authority of the board of directors, determined that these agreements should have been disclosed in the footnotes to its consolidated financial statements for the year ended December 31, 2012. Accordingly, the Company has restated the consolidated financial statements to include these disclosures.*
>
> The Company also determined that its obligation to pay liquidated damages under a registration payment that it entered into in connection with a financing transaction completed on February 14, 2013, which required the Company to

cause a registration statement to be declared effective by the Securities and Exchange Commission by May 15, 2013, should have also been disclosed. Accordingly, the Company is restating these consolidated financial statements to disclose that it allocated approximately $360,000 of the proceeds received in this financing transaction to a registration payment obligation that was deemed probable at the date that the financing transaction was completed.

(Emphasis supplied.)

87.     On September 16, 2013, the Company filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Shkreli and Panoff and disclosed the Company's second quarter 2013 financial results and financial position. In addition, the Form 10-Q contained certifications signed pursuant to SOX by Defendants Shkreli and Panoff, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications included in the Company's Form 10-Q were substantially similar to those described in ¶ 81.

88.     With respect to related party transactions, the MD&A section of the 10-Q stated:

In the second quarter of 2013, the Company, its Chief Executive Officer and a related party became parties to a series of agreements to settle up to $2,286,511 of liabilities, which Company management believes are the primary obligation of the related party. The Company paid $593,111 of these settlements in the second quarter on behalf of the related party and had outstanding liabilities of $1,691,400 as of June 30, 2013, which is entirely past due as of the date of this filing. The counter parties to these agreements reserve the right to demand payment at any time. The Chief Executive Officer also agreed to deliver or cause to be delivered 47,128 shares of common stock to one of the counter parties as a separate component of one of these agreements. Accordingly, the Company does not believe it is required to record a liability for the shared-based component of this specific agreement during the second quarter ended June 30, 2013. There is uncertainty as to whether the related party will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary (see Note 9).

On August 29, 2013, the Company entered into an additional settlement agreement for $300,000 due following execution of the agreement. As of the date of this filing, this settlement has been paid (see Note 13).

***

In the second quarter of 2013, the Company, its Chief Executive Officer and a related party became party to a series of agreements to settle up to $2,286,511 of liabilities, which Company management believes are the primary obligation of the related party. The Company and the related party have entered into indemnification agreements whereby the related party has agreed to defend and hold the Company harmless against all such obligations and amounts, whether paid or unpaid, arising from these agreements. Notwithstanding the indemnification, the Company recorded a $2,286,511 charge to operations during the quarter ended June 30, 2013 and a corresponding liability of $1,691,400 for the difference between (a) the aggregate amount of all such settlements, and (b) $593,111 of cash and non-cash consideration that the Company paid to immediately settle a portion of the agreement on behalf of the related party. The $1,691,400 is past due as of the August 9, 2013. The counter parties to these agreements reserve the right to demand payment at any time. The Chief Executive Officer also agreed to deliver or cause to be delivered 47,128 shares of common stock to one of the counter parties as a separate component of one of these agreements. Accordingly, the Company does not believe it is required to record a liability for the shared-based component of this specific agreement during the second quarter ended June 30, 2013. There is uncertainty as to whether the related party will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary. As of the date of this filing, the Company owes $1,655,000 in cash and 5,000 shares of common stock valued at $36,400, due immediately.

Concurrent with the execution of such settlement agreements, the Company received promissory notes from the related party whereby the related party agreed to pay the Company the principal amount of $593,111 plus interest at an annualized rate of 5% as reimbursement of the payments that the Company made to settle a portion of the agreements.

*** 

*Additional Settlement Agreement*

On August 29, 2013, the Company entered into an additional settlement agreement for $300,000 due following execution of the agreement. The Company charged this amount to selling, general and administrative expense in its statement of operations. As of the date of this filing, this settlement has been paid.

89.     The statements referenced in ¶¶ 87-88 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or

misleading statements and/or failed to disclose that Defendants engaged in numerous related party transactions including (1) between September 2013 and March 2014, the Company entered into several purported "consulting" agreements providing for the issuance of Company stock and cash payments that were actually intended to settle claims against MSMB and Shkreli personally; and (2) a cash and Company stock settlement was a related party transaction because it settled claims against MSMB and Shkreli. Moreover, on August 29, 2013, the Company entered into an additional settlement agreement for $300,000 due following execution of the agreement, but omitted that the settlement had been made with a former investor in MSMB and the predominant purpose of the payment was to settle and release claims against MSMB and Shkreli. Defendants also failed to disclose the existence of an additional settlement agreement to which the Company was a party that called for the issuance of 80,000 Company shares to an investor in MSMB.

90.     Also on September 16, 2013, the Company filed an amended annual report on Form 10-K/A with the SEC which was signed by the Individual Defendants, and disclosed the Company's year-end 2012 annual financial results and financial position. In addition, the Form 10-K/A contained certifications signed pursuant to SOX by Defendants Shkreli and Panoff, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications included in the Company's Form 10-Q were substantially similar to those described in ¶ 81.

91.     The 10-K/A was filed to amend Retrophin's "Transition Report on Form 10-K for the transition period from March 1, 2012 to December 31, 2012, as filed with the Securities and Exchange Commission (the "SEC") on June 13, 2013 (the "Original Filing"), solely for the

purpose of amending Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and Part II, Item 8. Financial Statements and Supplementary Data to include disclosure and a footnote to [the Company's] financial statements relating to events that occurred after the conclusion of the period covered by the Original Filing."

92.    The 10-K/A disclosed with respect to subsequent events related to settlements:

In the second quarter of 2013, the Company, its Chief Executive Officer and a related party became party to a series of agreements to settle up to $2,286,511 of liabilities, which Company management believes are the primary obligation of the related party. The Company and the related party have entered into indemnification agreements whereby the related party has agreed to defend and hold the Company harmless against all such obligations and amounts, whether paid or unpaid, arising from these agreements. Notwithstanding the indemnification, the Company recorded a $2,286,511 charge to operations during the quarter ended June 30, 2013 that was offset by a corresponding liability of $1,691,400 for the difference between (a) the aggregate amount of all such settlements, and (b) $593,111 of cash and non-cash consideration that the Company paid to immediately settle a portion of the agreement on behalf of the related party. Of the total outstanding $1,691,400 settlement liability, $300,000 is past due, $713,900 was due in July 2013, and $677,500 was due in August 2013. The counter parties to these agreements reserve the right to demand payment at any time. The Chief Executive Officer also agreed to deliver or cause to be delivered 47,128 shares of common stock in the Company to one of the counter parties as a separate component of one of these agreements. Accordingly, the Company does not believe it is required to record a liability for the shared-based component of this specific agreement during the second quarter ended June 30, 2013. There is uncertainty as to whether the related party will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary.

Concurrent with the execution of such settlement agreements, the Company received promissory notes from the related party whereby the related party agreed to pay the Company the principal amount of $593,111 plus interest at an annualized rate of 5% as reimbursement of the payments that the Company made to settle a portion of the agreements.

93.    The statements referenced in ¶¶ 90-92 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or

misleading statements and/or failed to disclose that: (i) Retrophin's founder and Chief Executive Officer was committing stock-trading irregularities during the Class Period; and (ii) Defendants engaged in numerous related party transactions including (1) between September 2013 and March 2014, the Company entered into several purported "consulting" agreements providing for the issuance of Company stock and cash payments that were actually intended to settle claims against MSMB and Shkreli personally; and (2) a cash and Company stock settlement was a related party transaction because it settled claims against MSMB and Shkreli. Moreover, the Form 10-K/A, even though it restated the financial results and disclosed related party transaction, was false and misleading because it omitted any mention that, during the first quarter of 2013, Retrophin paid a $900,000 promissory note in favor of MSMB and forgave other monetary obligations of approximately $1.2 million for the benefit of MSMB and Shkreli.

94.     On November 13, 2013, the Company filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Shkreli and Panoff, and disclosed the Company's third quarter 2013 financial results and financial position. In addition, the Form 10-Q contained certifications signed pursuant to SOX by Defendants Shkreli and Panoff, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications included in the Company's Form 10-Q were substantially similar to those described in ¶ 81.

95.     With respect to related party transactions, the MD&A section of the 10-Q stated:

> In the second quarter of 2013, the Company, its Chief Executive Officer and a related party became parties to a series of agreements to settle up to $2,284,511 of liabilities, which Company management believes are the primary obligation of the related party. The Company paid $593,111 of these settlements in the second quarter on behalf of the related party and had outstanding liabilities of $1,691,400 as of September 30, 2013, which the Company paid as of the date of this filing. Concurrent with the execution and payment of such settlement agreements, the Company entered into indemnification agreements and received promissory notes

from the related party whereby the related party agreed to pay the Company the principal amount of $2,284,511 plus interest at an annualized rate of 5% as reimbursement of payments that the Company made to settle a portion of the agreements. The Chief Executive Officer also agreed to deliver or cause to be delivered 47,128 shares of common stock to one of the counter parties as a separate component of one of these agreements. Accordingly, the Company does not believe it is required to record a liability for the shared-based component of this specific agreement during the second quarter ended September 30, 2013. There is uncertainty as to whether the related party will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary (see Note 10).

On August 29, 2013, the Company entered into and paid an additional settlement agreement for $300,000 due following execution of the agreement. As of the date of this filing, this settlement has been paid.

***

In the second quarter of 2013, the Company, its Chief Executive Officer and a related party, which is a former investor in the Company that was previously managed by the Company's Chief Executive officer, became party to a series of agreements to settle up to $2,284,511 of liabilities, which Company management believes are the primary obligation of the related party. The Company and the related party have entered into indemnification agreements whereby the related party has agreed to defend and hold the Company harmless against all such obligations and amounts, whether paid or unpaid, arising from these agreements. Notwithstanding the indemnification, the Company recorded a $2,284,511 charge to operations during the quarter ended September 30, 2013 that was offset by a corresponding liability of $1,691,400 for the difference between (a) the aggregate amount of all such settlements, and (b) $593,111 of cash and non-cash consideration that the Company paid to immediately settle a portion of the agreement on behalf of the related party. The $1,691,400 is entirely paid as of the date of this filing. In addition, the Chief Executive Officer also agreed to provide one of the counter parties with 47,128 shares of his common stock in the Company as a separate component of one of these settlement agreements. Accordingly, the Company does not believe it is required to record a liability for the shared-based component of this specific agreement during the third quarter ended September 30, 2013. There is uncertainty as to whether the related party will have sufficient liquidity to repay the Company or fund the indemnification agreements should it become necessary.

Concurrent with the execution of such settlement agreements, the Company received promissory notes from the related party whereby the related party agreed to pay the Company the principal amount of $593,111 plus interest at an annualized rate of 5% as reimbursement of the payments that the Company made to settle a portion of the agreements.

In October 2013, the Company paid $1,655,000 in cash and 5,000 shares of common stock valued at $36,400 to settle agreements on behalf of a related party. Upon payment, the Company and the related party entered into promissory notes whereby the related party agreed to pay the Company the principal amount of $1,691,400 plus interest at an annualized rate of 5% as reimbursement of payments that the Company made to settle a portion of the agreements.

96.      On November 18, 2013, the Company issued a press release announcing the financial results for the third quarter ended September 30, 2013. Retrophin reported a net loss of $10.9 million for the quarter, compared to a net loss of $8.5 million during the same period in 2012. According to the press release, Retrophin's balance sheet at September 30, 2013 included approximately $16.4 million in cash, cash equivalents and marketable securities, compared to $11.4 million as of December 31, 2012.

97.      The statements referenced in ¶¶ 94-96 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Retrophin's founder and Chief Executive Officer was committing stock-trading irregularities during the Class Period; and (ii) Defendants engaged in numerous related party transactions including (1) between September 2013 and March 2014, the Company entered into several purported "consulting" agreements providing for the issuance of Company stock and cash payments that were actually intended to settle claims against MSMB and Shkreli personally; (2) a settlement agreement pursuant to which the Company had paid $300,000 cash was also a related party agreement because it was made with a former investor in MSMB and the predominant purpose was to settle and release claims against MSMB and Shkreli personally; (3) the Company omitted that it Shkreli had caused to be delivered an additional 80,000 shares of common stock of the Company to a former investor in

MSMB pursuant to an undisclosed settlement agreement to which the Company was a party; and (4) during the first quarter of 2013, Retrophin paid a $900,000 promissory note in favor of MSMB and forgave other monetary obligations of approximately $1.2 million for the benefit of MSMB and Shkreli.

98.     On March 27, 2014, the Company issued a press release announcing financial and operating results for year ended December 31, 2013. Retrophin reported a net loss of $33.8 million for the year ended December 31, 2013. During the same period in 2012, Retrophin recorded a net loss of $30.3 million. Loss from operations was $24 million for the year ended December 31, 2013, compared to a loss from operations of $30.3 million for the year ended December 31, 2012. Retrophin's balance sheet at December 31, 2013 included approximately $6.1 million in cash, cash equivalents and marketable securities and no debt.

99.     On March 28, 2014, the Company filed an annual report on Form 10-K with the SEC which was signed by Defendants Shkreli, Panoff, and Paley, and reiterated the Company's previously announced annual financial results and financial position. In addition, the Form 10-K contained signed SOX certifications by Defendants Shkreli and Panoff, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications included in the Company's Form 10-K were substantially similar to those described in ¶ 81.

100.     The 2013 Form 10-K also stated:

*Employee Equity Issuance*

Subsequent to year end, we issued 400,000 shares of restricted common stock to three officers and 1,210,000 options to purchase shares of our common stock to four officers and other employees.

101.   The 2013 Form 10-K also included the following language that failed to disclose

material facts regarding the related party deals:

> In the second quarter of 2013, the Company, its Chief Executive Officer, MSMB
> CAPITAL MANAGEMENT, LP ("MSMB Capital LP"), a Delaware limited
> partnership, MSMB CAPITAL MANAGEMENT LLC ("MSMB Capital LLC"),
> a Delaware limited liability company, MSMB HEALTHCARE LP ("MSMB
> Healthcare"), a Delaware limited partnership, MSMB HEALTHCARE
> INVESTORS LLC ("MSMB Investors"), a Delaware limited liability company,
> MSMB HEALTHCARE MANAGEMENT LLC ("MSMB Management" and,
> together with MSMB Capital LP, MSMB Capital LLC, MSMB Healthcare and
> MSMB Investors, the "MSMB Entities"), a Delaware limited liability company
> became parties to a series of agreements to settle up to $2,284,511 of liabilities
> owed to certain investors in the MSMB Entities which had invested in the
> Company and objected to the number of shares of common stock in the Company
> that they received as a distribution from such funds. Because the Company was a
> party to these settlements, it applied the accounting guidance provided in ASU
> 2013-04 ("ASU 2013-04"). This guidance requires companies to measure
> obligations resulting from joint and several liability arrangements as the sum of
> the amount that the entity has (a) contractually agreed to pay and (b) any
> additional amounts that the entity expects to pay on behalf of its co-obligors.
> Company management believes such liabilities are the obligation of the MSMB
> Entities and concurrent with the execution and payment of such settlement
> agreements, the Company entered into indemnification agreements and received
> promissory notes from the MSMB Entities, whereby the MSMB Entities jointly
> and severally agreed to pay the Company the principal amount of $2,284,511,
> plus interest at an annualized rate of 5% as reimbursement of payments that the
> Company made to settle a portion of the agreements. The Company paid
> $2,284,511 of these settlements during the year ended December 31, 2013. The
> Chief Executive Officer also agreed to deliver or cause to be delivered 47,128
> shares of common stock to one of the counter parties as a separate component of
> one of these agreements. Accordingly, the Company does not believe it is
> required to record a liability for the shared-based component of this specific
> agreement during the year ended December 31, 2013. There is uncertainty as to
> whether the MSMB Entities will have sufficient liquidity to repay the Company
> or fund the indemnification agreements should it become necessary.

> On August 29, 2013, the Company entered into and paid an additional settlement
> agreement for $300,000 due following execution of the agreement.

102.   The statements referenced in ¶¶ 98-102 above were materially false and/or

misleading because they misrepresented and failed to disclose the following adverse facts

pertaining to the Company's business, operational and compliance policies, which were known

to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Retrophin's founder and Chief Executive Officer was committing stock-trading irregularities during the Class Period; (ii) said irregularities included grants of Retrophin stock to certain recipients without shareholder approval, specifically that: Defendants issued 25,000 shares to Amanda Herring-Abbott, 40,000 shares to Elena Korobetskaya, 25,00 shares to Meghan Kelly, and 50,000 shares to Brian Selby as of February 23, 2014 without stockholder approval, violating NASDAQ's stockholder approval requirement of Listing Rule 5635(c), related to the Company's grant of those stock awards; (iii) as a result of the above, Defendants committed violations of the Company's Incentive Compensation Plan and other securities rules, including NASDAQ Listing Rules; (iv) the Company's financial statements and other SEC filings were materially false and/or misleading at all relevant times; and (v) Defendants engaged in numerous related party transactions including (1) between September 2013 and March 2014, the Company entered into several purported "consulting" agreements providing for the issuance of Company stock and cash payments that were actually intended to settle claims against MSMB and Shkreli personally; (2) a cash and Company stock settlement was a related party transaction because it settled claims against MSMB and Shkreli; and (3) during the first quarter of 2013, Retrophin paid a $900,000 promissory note in favor of MSMB and forgave other monetary obligations of approximately $1.2 million for the benefit of MSMB and Shkreli.

103.    On April 14, 2014, the Company filed a Definitive Proxy Statement on Form DEF14A with the SEC, which attached as an exhibit Retrophin's 2014 Incentive Compensation Plan. According to the Proxy, on March 20, 2014, the Board of Directors approved the Plan, which would be effective May 9, 2014 subject to stockholder approval at the 2014 Annual

Meeting. According to the Proxy, "[t]he compensation and talent development committee has adopted a formal, written compensation and talent development committee charter that complies with SEC rules and regulations and the NASDAQ listing standards," and "[t]he nominating and corporate governance committee has adopted a formal, written nominating and corporate governance committee charter that complies with SEC rules and regulations and the NASDAQ listing standards."

104.     The Plan covers stock options, stock appreciation rights, restricted stock and restricted stock units, deferred stock, performance units and annual incentive awards. As indicated in the Plan, the Compensation Committee shall administer the Plan. Moreover, Section 3.2 of the Plan provides:

> <u>Powers of the Committee.</u> Subject to and consistent with the provisions of the Plan, the Committee ***shall have full power and authority and sole discretion as follows***:
>
> (b)     to determine when, to whom (*i.e.*, what Eligible Persons) and in what types and amounts Awards should be granted;
>
> (c)     to grant Awards to Eligible Persons in any number, and to determine the terms and conditions applicable to each Award, including (in each case, based on such considerations as the Committee shall determine) conditions intended to comply with Code Section 409A, the number of Shares or the amount of cash or other property to which an Award will relate, any Option Price or Strike Price, grant price or purchase price, any limitation or Restriction, any schedule for or performance conditions relating to the earning of the Award or the lapse of limitations, forfeiture restrictions, restrictive covenants, restrictions on exercisability or transferability, any Performance Goals, including those relating to the Company and/or a Subsidiary and/or any division thereof and/or an individual, and/or vesting based on the passage of time, satisfaction of performance criteria or the occurrence of one or more events or conditions;
>
> (d)     to determine the benefit (including any Bonus Opportunity) payable under any Award and to determine whether any performance, vesting or transfer conditions, including Performance Measures or Performance Goals, have been satisfied;

(e)     to determine whether or not specific Awards shall be granted in connection with other specific Awards;

(f)     to determine the Term of an Award, as applicable;

(g)     to determine the amount, if any, that a Grantee shall pay for Restricted Stock, whether to permit or require the payment of cash dividends thereon to be paid and/or deferred, and the terms related thereto, when Restricted Stock (including Restricted Stock acquired upon the exercise of an Option) shall be forfeited and whether such Shares shall be held in escrow or other custodial arrangement;

(h)     to determine whether, to what extent and under what circumstances an Award may be settled in, or the exercise price of an Award may be paid in, cash, Shares, other Awards or other property, or an Award may be accelerated, vested, canceled, forfeited or surrendered or any terms of the Award may be waived, and to accelerate the exercisability of, and to accelerate or waive any or all of the terms and conditions applicable to, any Award or any group of Awards for any reason and at any time or to extend the period subsequent to the Termination of Service within which an Award may continue to vest and/or be exercised;

(i)     to determine with respect to Awards granted to Eligible Persons, whether, to what extent and under what circumstances cash, Shares, other Awards, other property and other amounts payable with respect to an Award will be deferred, either at the election of the Grantee or if and to the extent specified in the Award Agreement automatically or at the election of the Committee (for purposes of limiting loss of deductions pursuant to Code Section 162(m) or otherwise) and to provide for the payment of interest or other rate of return determined with reference to a predetermined actual investment or independently set interest rate, or with respect to other bases permitted under Code Section 162(m), Code Section 409A or otherwise, for the period between the date of exercise and the date of payment or settlement of the Award;

(j)     to determine whether a Grantee has a Disability;

(k)     to determine whether and under what circumstances a Grantee has incurred a Termination of Service (*e.g.*, whether Termination of Service was for Cause);

(l)     to make, amend, suspend, waive and rescind rules and regulations relating to the Plan;

(m)     without the consent of the Grantee, to make adjustments in the terms and conditions of, and the criteria in, Awards in recognition of unusual or non-recurring events (including events described in <u>Section 4.2</u>) affecting an

Employer or the financial statements of an Employer, or in response to changes in applicable laws, regulations or accounting principles; provided, however, that in no event shall such adjustment increase the value of an Award for a person expected to be a Covered Employee for whom the Committee desires to have the Performance-Based Exception apply;

(n)     to appoint such agents as the Committee may deem necessary or advisable to administer the Plan;

(o)     to determine the terms and conditions of all Award Agreements applicable to Eligible Persons (which need not be identical) and, with the consent of the Grantee (except as provided in this Section 3.2(n), and Sections 5.5 and 15.2), to amend any such Award Agreement at any time; provided, however, that the consent of the Grantee shall not be required for any amendment (i) that does not adversely affect the rights of the Grantee, (ii) that is necessary or advisable (as determined by the Committee) to carry out the purpose of the Award as a result of any new law or regulation, or a change in an existing law or regulation or interpretation thereof, (iii) to the extent the Award Agreement specifically permits amendment without consent, or (iv) to the extent such amendment is a termination that is intended to comply with Treasury Regulations Section 1.409A-3(j)(4)(ix);

(p)     to make such adjustments or modifications to Awards to Grantees who are working outside the United States as are advisable to fulfill the purposes of the Plan or to comply with applicable local law and to establish sub-plans for Eligible Persons outside the United States with such provisions as are consistent with the principles of the Plan (but in compliance with local law) as may be suitable in other jurisdictions;

(q)     to impose such additional terms and conditions upon the grant, exercise or retention of Awards as the Committee may, before or concurrently with the grant thereof, deem appropriate, including limiting the percentage of Awards that may from time to time be exercised by a Grantee and requiring the Grantee to enter into restrictive covenants;

(r)     to correct any defect, supply any omission or reconcile any inconsistency, and to construe and interpret the Plan, any rules and regulations adopted hereunder, Award Agreements or any other instrument entered into or relating to an Award under the Plan; and

(s)     to take any other action with respect to any matters relating to the Plan for which it is responsible and to make all other decisions and determinations, including factual determinations, as may be required under the terms of the Plan or as the Committee may deem necessary or advisable for the administration of the Plan.

(Emphasis supplied.)

105.    The statements referenced in ¶¶ 103-104 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Retrophin's founder and Chief Executive Officer was committing stock-trading irregularities during the Class Period; (ii) said irregularities included grants of Retrophin stock to certain recipients in the absence of a shareholder-approved distribution plan, failures to disclose stock grants, and grants of stock in violation of the Company's Incentive Compensation Plan; (iii) as a result of the above, Defendants committed violations of the Company's Incentive Compensation Plan and other securities rules, including NASDAQ Listing Rules; (iv) the Company's financial statements and other SEC filings were materially false and/or misleading at all relevant times; (v) failed to disclose that Defendants issued 25,000 shares to Amanda Herring-Abbott, 40,000 shares to Elena Korobetskaya, 25,00 shares to Meghan Kelly, and 50,000 shares to Brian Selby as of February 23, 2014 without stockholder approval, violating NASDAQ's stockholder approval requirement of Listing Rule 5635(c), related to the Company's grant of those stock awards; and (vi) Defendants engaged in numerous related party transactions including (1) between September 2013 and March 2014, the Company entered into several purported "consulting" agreements providing for the issuance of Company stock and cash payments that were actually intended to settle claims against MSMB and Shkreli personally; (2) a cash and Company stock settlement was a related party transaction because it settled claims against MSMB and Shkreli; (3) in the second quarter of 2014, the Company settled two lawsuits for $200,00 in cash to pay individuals

to transfer 176,388 shares of Retrophin common stock directly to Shkreli; and (4) during the first quarter of 2013, Retrophin paid a $900,000 promissory note in favor of MSMB and forgave other monetary obligations of approximately $1.2 million for the benefit of MSMB and Shkreli.

106.    On May 13, 2014, the Company filed a Form 8-K with the SEC announcing that Retrophin stockholders voted to approve the Company's 2014 Incentive Compensation Plan at the 2014 Annual Meeting on May 9, 2014.

107.    On May 14, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the first quarter ended March 31, 2014. Retrophin reported a net loss of $70.6 million for the quarter ended March 31, 2014, compared to a net loss of $4.9 million during the same period in 2013. Retrophin's balance sheet at March 31, 2014 included $5 million in cash, cash equivalents and marketable securities.

108.    On May 15, 2014, the Company filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Shkreli and Panoff, and reiterated the Company's previously announced annual financial results and financial position. In addition, the Form 10-Q contained SOX certifications signed by Defendants Shkreli and Panoff, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications included in the Company's Form 10-Q were substantially similar to those described in ¶ 81.

109.    With regard to the Company's incentive-based compensation, the first quarter Form 10-Q also stated:

*Share Based Compensation*

For the three months ended March 31, 2014, the Company issued 716,500 shares of restricted common stock. Compensation expense amounted to $3,655,652 for the three months ended March 31, 2014.

For the three months ended March 31, 2013, the Company issued 12,500 shares of restricted common stock. Compensation expense amounted to $159,205 for the three months ended March 31, 2013.

*Restricted Shares*

As of March 31, 2014 and December 31, 2013, there was approximately $8,395,949 and $1,105,967 of unrecognized compensation cost related to restricted shares issued. As of March 31, 2014 and December 31, 2013, these amounts are expected to be recognized over a weighted average period of 2.80 and 2.19 years, respectively. Unvested restricted shares consist of the following as of March 31, 2014 and December 31, 2013.

| | Employee - number of shares | Non Employee - number of shares | Total number of shares | Weighted Average Grant Date Fair Value |
|---|---|---|---|---|
| Unvested December 31, 2012 | 52,772 | 214,996 | 267,768 | $ 3.20 |
| Granted | 135,000 | - | 135,000 | 6.24 |
| Vested | (36,724) | (139,069) | (175,793) | 5.44 |
| Forfeited | (20,833) | (37,500) | (58,333) | 4.00 |
| Unvested December 31, 2013 | 130,215 | 38,427 | 168,642 | 6.44 |
| Granted | 400,000 | - | 400,000 | 15.25 |
| Vested | (16,810) | (18,347) | (35,247) | 13.67 |
| Forfeited | - | - | - | - |
| Unvested March 31, 2014 | 513,405 | 19,990 | 533,395 | $ 13.53 |

*Exercise of Warrants*

During the three months ended March 31, 2014, the Company issued 833,197 shares of common stock upon the exercise of warrants for cash received by the Company in the amount of $4,039,151. The Company reclassified $9,300,160 of derivative liability as equity for the value of these warrants on the date of exercise. The warrants were revalued immediately prior to exercise and the change in the fair value of the warrants was recorded as other expense in the condensed consolidated financial statements of the Company.

*Stock Options*

During the three months ended March 31, 2014, the Company granted options to purchase 1,160,000 shares of common stock to employees of the Company. The options vest as follows: (i) 760,000 vest quarterly in pro rata portions during the 3 years following the effective date of April 1, 2014, (ii) 200,000 vest in twelve equal installments on the last day of each calendar quarter beginning on March 31, 2014, (iii) 100,000 vest upon such time as the Company's revenues meet or exceed $50 million in the aggregate over any consecutive four fiscal quarter period (but no earlier than February 24, 2015), (iv) 50,000 vest upon such time as

the trailing twenty day average of the closing price of the Company's common stock equals or exceeds $25 per share (but no earlier than February 24, 2015), and (v) 50,000 upon such time as the trailing twenty day average of the closing price of the Company's common stock equals or exceeds $33 per share (but no earlier than February 24, 2016).

The Company valued 960,000 of these options using the Black-Scholes option-pricing model with the following assumptions: risk-free interest rate of 1.57%, expected term (in years) of 5.81, expected volatility of 70%, and an exercise price equal to the fair value of the stock on the date of issuance of $19.00 per share. The Company valued 100,000 of the market performance based options using the Binomial Lattice options pricing model. The Company will record stock compensation expense for the 100,000 options that vest based on revenue performance conditions when achievement is considered probable. No compensation expense has been recorded in the current period in relation to the revenue performance based options as this achievement has not yet been deemed probable. For the three months ended March 31, 2014 and 2013, the Company recognized $1,350,703 and $0, respectively, as compensation expense related to the Options. As of March 31, 2014, there was approximately $24,091,555 of unrecognized compensation expense related to stock options.

*Stock Repurchases*

In the first quarter of 2014, the Company repurchased 248,801 shares of its common stock for an aggregate purchase price of $2,257,336. The Company currently recognizes such repurchased common stock as treasury stock.

110.    The statements referenced in ¶¶ 106-109 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Retrophin's founder and Chief Executive Officer was committing stock-trading irregularities during the Class Period; (ii) said irregularities included grants of Retrophin stock to certain recipients in the absence of a shareholder-approved distribution plan, failures to disclose stock grants, and grants of stock in violation of the Company's Incentive Compensation Plan; (iii) as a result of the above, Defendants committed violations of the Company's Incentive Compensation Plan and other

securities rules, including NASDAQ Listing Rules; (iv) the Company's financial statements and other SEC filings were materially false and/or misleading at all relevant times; and (v) Defendants engaged in numerous related party transactions including (1) between September 2013 and March 2014, the Company entered into several purported "consulting" agreements providing for the issuance of Company stock and cash payments that were actually intended to settle claims against MSMB and Shkreli personally; and (2) a cash and Company stock settlement was a related party transaction because it settled claims against MSMB and Shkreli.

111.    On August 12, 2014, the Company issued a press release and filed a Form 8-K with the SEC, announcing its financial and operating results for the second quarter ended June 30, 2014. GAAP net income for the second quarter of 2014 was $8.5 million, or $0.33 per basic share and a $0.90 net loss per dilutive share, compared to a net loss of $5.0 million, or $0.41 per diluted share, for the second quarter of 2013. At June 30, 2014, Retrophin's balance sheet included $43.4 million in cash, cash equivalents and marketable securities.

112.    On August 14, 2014, the Company filed a quarterly report on Form 10-Q with the SEC which was signed by Defendants Shkreli and Panoff, and reiterated the Company's previously announced annual financial results and financial position. In addition, the Form 10-Q contained SOX certifications signed by Defendants Shkreli and Panoff, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting. The SOX certifications included in the Company's Form 10-Q were substantially similar to those described in ¶ 81.

113.    With regard to the Company's Incentive Compensation Plan, the second quarter Form 10-Q stated that:

*Share Based Compensation*

50

Share based compensation expenses consist of the following for the three months and six months ended June 30, 2014 and 2013, respectively:

| | Three Months Ended | | Six Months Ended | |
|---|---|---|---|---|
| | June 30, 2014 | June 30, 2013 | June 30, 2014 | June 30, 2013 |
| Restricted Shares | $ 2,857,681 | $ 91,705 | $ 6,513,331 | $ 250,909 |
| Stock Options | 2,150,591 | 36,683 | 3,501,295 | 36,683 |
| Total | $ 5,008,272 | $ 128,388 | $ 10,014,626 | $ 287,592 |

*Exercise of Warrants*

During the six months ended June 30, 2014, the Company issued 1,962,377 shares of common stock upon the exercise of warrants for cash received by the Company in the amount of $8,337,380. The Company reclassified $23,364,668 derivative liability as equity for the value of these warrants on the date of exercise. The warrants were revalued immediately prior to exercise and the change in the fair value of the warrants was recorded as other expense in the condensed consolidated financial statements of the Company.

*Stock Repurchases*

During the six months ended June 30, 2014, the Company repurchased 248,801 shares of its common stock for an aggregate purchase price of $2,257,336. The Company currently recognizes such repurchased common stock as treasury stock.

114.   The statements referenced in ¶¶ 111-113 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and compliance policies, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Retrophin's founder and Chief Executive Officer was committing stock-trading irregularities during the Class Period; (ii) said irregularities included grants of Retrophin stock to certain recipients in the absence of a shareholder-approved distribution plan, failures to disclose stock grants, and grants of stock in violation of the Company's Incentive Compensation Plan; (iii) as a result of the above,

Defendants committed violations of the Company's Incentive Compensation Plan and other securities rules, including NASDAQ Listing Rules; (iv) the Company's financial statements and other SEC filings were materially false and/or misleading at all relevant times; (v) failed to disclose that Defendants issued 25,000 shares to Brian Selby, 100,000 shares to Jesse Shefferman, 60,000 shares to Radko Komers, 20,000 shares to Shlomo Ovadia, 50,000 shares to Steve Rodems, 20,000 shares to Tracy Kane, 25,000 shares to Charlotte H. Brennand, 40,000 shares to Charles Tyler, 50,000 shares to Danhua Chen, 50,000 shares to Edward Kallel, 25,000 shares to Juan Betanzo, 50,000 shares to John Fiorito, 50,000 shares to John Leach, 10,000 shares to Kristina Capiak, 50,000 shares to Katherine Lucey, 50,000 shares to Matha Ho-Sing-Loy, and 20,000 shares to Maria Quinton as of May 9, 2014; 40,000 shares to Katherine Monahan and 50,000 shares to Mabel Tse as of May 15, 2014; 50,000 shares to Moorthy Palanki as of May 19, 2014; 40,000 shares to Patricia Brady and 50,000 shares to Andrew Hooper as of May 22, 2014; 50,000 shares to John Ridge and 50,000 shares to Kale Ruby as of June 9, 2014; 50,000 shares to Vince Wintermute as of June 11, 2014; 5,000 shares to Jonathan Ariza and 60,000 shares to Josephine Matta as of June 16, 2014; 15,000 shares to Wayne Deats and 50,000 shares to Karl Odquist as of June 23, 2014; 40,000 shares to Ross Goldstein as of June 24, 2014; 50,000 shares to Dyan Bryson as of June 30, 2014; and (vi) Defendants engaged in numerous related party transactions including (1) between September 2013 and March 2014, the Company entered into several purported "consulting" agreements providing for the issuance of Company stock and cash payments that were actually intended to settle claims against MSMB and Shkreli personally; (2) a cash and Company stock settlement was a related party transaction because it settled claims against MSMB and Shkreli; (3) in the second quarter of 2014, the Company settled two lawsuits for $200,00 in cash to pay individuals to transfer 176,388 shares of Retrophin

common stock directly to Shkreli; and (4) during the first quarter of 2013, Retrophin paid a $900,000 promissory note in favor of MSMB and forgave other monetary obligations of approximately $1.2 million for the benefit of MSMB and Shkreli.

115.    In addition, Defendants failed to disclose that they violated NASDAQ's stockholder approval requirement of Listing Rule 5635(c), by granting stock awards without stockholder approval in the following amounts as of August 18, 2014: 5,000 shares to Jenna Swan, 1,500 shares to Leah Cutler, 75,000 shares to Andrew Savage, and 20,000 shares to Viral Desai.

116.    On October 3, 2014 the Company issued a press release stating that it had made purported "inducement awards" to 66 employees:

> Retrophin Reports Inducement Grants under NASDAQ Listing Rule 5635(c)(4)
>
> NEW YORK -- (BUSINESS WIRE) -- Retrophin, Inc. (NASDAQ: RTRX) today announced the grant of inducement awards to 66 employees, as well as the grant of an inducement award to Alvin Shih, M.D., the Company's Executive Vice President of Research and Development. The awards were granted as an inducement material to each such employee's entering into employment with Retrophin pursuant to Rule 5635(b)(4) of the NASDAQ Listing Rules. 66 employees were granted inducement awards consisting of stock options to purchase an aggregate of 2,014,500 shares of Retrophin common stock and 200,000 shares of restricted common stock, and Dr. Shih was granted an inducement award consisting of 230,000 shares of restricted common stock. The stock options and restricted common stock generally vest in equal quarterly installments over a period of three years. The stock options are nonstatutory stock options and have an exercise price equal to the fair market value of Retrophin's common stock on their grant date.

117.    The foregoing was false and misleading because it omitted the failed to disclose that Defendants, without stockholder approval, violated NASDAQ's stockholder approval requirement of Listing Rule 5635(c), related to the Company's grant of stock awards in the amounts detailed at Exhibit A hereto.

**The Truth Emerges**

118.    The truth was revealed through a series of partial disclosures.

119.    On September 13, 2013, after the close of the market, the Company filed an amended Form 10-K for the year ended December 31, 2012, to include disclosures of certain settlement agreements that Retrophin entered into subsequent to the date of the balance sheet and corrections to its accounting for proceeds received in a financing transaction completed in February 2013. The Company's 2013 Form 10-K described the restatement as follows:

**Restatement of December 31, 2012 Financial Statements**

On September 13, 2013, we determined that we were required to file an amendment to our audited consolidated financial statement for the year ended December 31, 2012 included in our Transitional Report on Form 10-K. We determined, after consultation with our board of directors and our independent registered public accounting firm that it would be necessary to restate our December 31, 2012 consolidated financial statements to include disclosures of certain agreements that we entered into subsequent to the date of the balance sheet and corrections to our accounting for proceeds received in a financing transaction we completed in February 2013. The addition of these footnote disclosures in our December 31, 2012 consolidated financial statements had no impact on our balance sheet, or related consolidated statements of operations, changes in stockholders' (deficit) equity, loss per share or cash flows for the year ended December 31, 2012. On September 16, 2013, we amended our Transition Report on Form 10-K for the transition period from March 1, 2012 to December 31, 2012, as filed with the SEC on June 13, 2013, solely for the purpose of amending Part II, Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations and Part II, Item 8. Financial Statements and Supplementary Data to include disclosure and a footnote to our financial statements relating to events that occurred after the conclusion of the period covered by the original filing. The disclosure below reflects the changes made in such amendment. We further determined that it would be necessary for us to restate our March 31, 2013 condensed consolidated financial statements to include the same disclosures in these financial statements that we were required to make in our December 31, 2012 financial statements, and to correct our accounting for the allocation of $360,000 in proceeds we received in the financing transaction we completed in February 2013.

120.    As a result of this news, shares of Retrophin fell $0.40, or over 5%, to close at $6.80 on the next trading day, September 16, 2013.

121.    On April 4, 2014, the Company filed a Form 8-K with the SEC announcing the

termination of its auditor, Marcum LLP. In the Form 8-K, the Company stated in part:

> On March 31, 2014, the Audit Committee (the "Audit Committee") of the Board
> of Directors of Retrophin, Inc. (the "Company"), notified Marcum LLP
> ("Marcum") that it had determined not to engage Marcum as the Company's
> independent registered public accounting firm for the fiscal year ending
> December 31, 2014, and accordingly dismissed Marcum effective as of such date.
> On and effective as of that same date, the Company entered into an engagement
> letter with BDO USA, LLP ("BDO"), approved by the Audit Committee, and
> engaged BDO as the Company's independent registered public accounting firm.

122.    As a result of this news, shares of Retrophin fell $1.04, or over 5%, to close at

$17.99 on the next trading day, April 7, 2014.

123.    On May 28, 2014, Blue Ridge Buffetologist posted the May 28th Seeking Alpha

Article, which noted that "approximately $3 million of Retrophin shareholder money was used to

settle and extinguish legal liabilities of MSMB Capital (and indirectly the CEO)" and that

numerous "unnamed consultants" received large amounts of Retrophin stock. The article noted

that the predecessor to Retrophin, Desert Gateway, Inc., was controlled by an entity owned by

Ruth Shepley, who reportedly was instrumental in creating various shell companies in the U.S.

that were later implicated in Chinese reverse merger frauds (*i.e.*, Telestone Technologies Corp.,

China Bio-Energy Corp., and CH Lighting International).

124.    As a result of this news, shares of Retrophin fell $1.05, or over 7%, to close at

$12.88 on May 29, 2014.

125.    On September 16, 2014, after the close of trading, the Company issued a press

release and filed a Form 8-K with the SEC announcing that on September 15, 2014, it had

reached an agreement with its CFO, Marc Panoff, pursuant to which Mr. Panoff's employment

with the Company will terminate, effective as of February 28, 2015. Also, the Company

announced that on September 10, 2014, Jeffrey Paley, MD abruptly stepped down as a member

of the Board of Directors. The Form 8-K also disclosed that, on September 12, 2014, NASDAQ notified the Company that its Board of Directors was no longer comprised of a majority of independent directors as required by Listing Rule 5605(b)(1) and that the Audit Committee was no longer comprised of at least three independent directors as required by Listing Rule 5605(c)(2)(A).

126.    As a result of this news, shares of Retrophin fell $1.03 or over 8%, on unusually heavy trading volume, to close at $11.46 on September 17, 2014.

127.    On September 26, 2014, during the trading day, an analyst at Seeking Alpha reported additional information regarding red flags at Retrophin in an article entitled, *Retrophin: Additional Red Flags Signal Extreme Caution for Investors*. The article summarized the circumstances surrounding Shkreli's erratic and improper behavior as described in court filings, redaction of the Company's term credit agreement, failure of internal controls, the Company's continuing cash burn, outrageous price hikes for several drugs it markets, and the Company's shrinking drug pipeline.

128.    On this news, shares of Retrophin fell from a $10.64 open on September 26, 2014 to close at $9.82 on September 29, 2014 (the next trading day), a drop of $0.82 per share, or almost 8%.

129.    Thereafter, on September 30, 2014, after the close of trading, the Company issued a press release announcing that its Board of Directors had terminated Chief Executive Officer and founder, Martin Shkreli, effective immediately, and appointed Stephen Aselage as interim Chief Executive Officer.

130.    As a result of this news, shares of Retrophin fell $0.40 or almost 4.5%, on unusually heavy trading volume, to close at $8.62 on October 1, 2014.

131.    On October 1, 2014, in an article entitled, *The Short-Seller Who Started a Biotech Firm Gets Ousted by His Board*, Bloomberg reported that, "[a]fter a rocky few months marked by erratic public statements from Shkreli, his board of directors at Retrophin (RTRX), an orphan-disease drug maker, apparently got antsy. On Tuesday, the board abruptly fired him." According to Bloomberg, "[a]n avid user of Twitter (TWTR), Shkreli used the site to declare: 'Rather upset at my inane BOD [board of directors] who was overly focused on irrelevant innuendo but also can now pursue a NewCo.' The latter reference apparently alludes to Shkreli's plan to start a new company, which might prove challenging given the nature of his departure from Retrophin."

132.    The very next day, October 2, 2014, Bloomberg released another article entitled, *Biotech Company Retrophin Fired CEO Because of Stock Irregularities*. The article reported:

> According to people familiar with the company, the board concluded that Shkreli had committed stock-trading irregularities and other violations of securities rules. The violations included grants of Retrophin stock to certain recipients in the absence of a shareholder-approved distribution plan, failures to disclose stock grants, and grants of stock above limits imposed by the plan that was eventually put in place, the people said. Shkreli has not returned phone messages seeking comment.

> Retrophin is expected to issue a public statement and regulatory filing tomorrow morning, in which it will explain how it proposes to bring itself back into compliance. One step company executives are taking is to surrender certain stock-option grants made while Shkreli was still in the chief executive's chair, the people familiar with the company said.

In addition, as reported by Bloomberg, the Company's Chief Operating Officer, Stephen Aselage, who has taken over as CEO, "said the announcement scheduled for tomorrow will lay out a plan for bringing Retrophin 'into Nasdaq compliance' and will include information on personnel appointments 'in the near-term time frame.'"

133.    In an October 3, 2014 press release, the Company announced the grant of "inducement awards" to 66 employees, as well as the grant of an inducement award to Alvin Shih, M.D., the Company's Executive Vice President of Research and Development.

134.    Shortly thereafter, on October 6, 2014, after the close of the market, an analyst at Seeking Alpha reported additional information regarding Shkreli's trades in an article entitled, *A Strange Situation at Retrophin Becomes Even More Bizarre*. The article summarized the suspicious circumstances surrounding Shkreli's departure from the Company:

    a.   According to *Businessweek*'s sources, Retrophin's board of directors believes that Shkreli has committed various securities violations;

    b.   Shkreli has been accused of allegedly doing the following, in addition to what the company has asserted: harassing and threatening a former employee and his family members (including hacking their social media accounts) in gross violation of the company's Code of Ethics; misrepresenting the company's cash balances on a May 30th investor conference call; failing to pay debts and honor contractual obligations on repeated occasions in his former career as a fund manager; tipping Twitter followers to material nonpublic information regarding Retrophin in possible violation of securities laws; and engaging in pump-and-dump tactics with respect to the company's stock (dumping 292,000 shares of stock on unsuspecting investors immediately after issuing uberbullish "non-non-non-GAAP guidance" on May 29th);

    c.   Shkreli remains Retrophin's CEO with access to the company's premises and (presumably) the company's computer systems and books and records;

    d.   Shkreli has set up a new pharma company with 20 employees that could potentially compete with Retrophin using Retrophin's intellectual property (to which Shkreli has apparent access);

    e.   Shkreli is actively shorting and openly maligning other biotech companies, such as PTC Therapeutics (NASDAQ ticker PTCT);

    f.   Retrophin's board of directors remains powerless to remove Shkreli as CEO for cause, notwithstanding all of the foregoing;

    g.   Shkreli has merely been placed on "indefinite leave" which, according to him, "means nothing;" thus, Shkreli could potentially resume the full CEO role at a moment's notice;

    h.   Shkreli remains on the company's board of directors, despite his apparent suspension as CEO, with the ability to disrupt the proper functioning of the board; and

    i.   Retrophin now appears to have two CEOs simultaneously, leaving it unclear who is in charge at the company.

The Seeking Alpha analyst also generally questioned the "general level of dysfunction" within the Company, lowering its target price to only $1 per share:

> At this point, it is increasingly difficult to see how a beleaguered Retrophin can overcome the troubling behavior of its (former? current?) CEO Shkreli and the general level of dysfunction in the company's CSuite and on the board of directors. As mentioned in my prior article, I believe the company will likely need to raise additional capital within the next six months just to fund operations going forward. Yet, what sane lender would lend money to this entity in its current state? If funds run out (or the company otherwise defaults on its debt), virtually all of the assets of the company will go to pay off the lenders under the Athyrium loan facility. Even if anything were left after this debt were extinguished, the convertible noteholders would have second claim on the assets. Thus, the common equity would almost certainly end up completely worthless in a liquidation scenario.
>
> In light of the deteriorating situation within the company, the increasingly troubling behavior of founder (and apparently still CEO) Shkreli, the inability to ascertain whether the company complies (or will comply in the future) with its covenants under the Athyrium debt facility, the heightened Nasdaq delisting risk and the clear potential for an SEC investigation into admitted securities violations at the company, I am reducing my price target to $1/share.

135.    On this news, Retrophin stock dropped $0.21 per share from $11.00 to $10.79, a drop of almost 2%, and continued to fall for several days thereafter. In total, Retrophin stock fell successfully day-over-day from $11.00 on October 6, 2014 to $9.34 on October 13, 2014, a drop of $1.66 per share, or a staggering 15%.

136.    On December 15, 2014, the Company filed a Form 8-K with the SEC announcing that NASDAQ determined that Retrophin was out of compliance with listing requirements related to Defendants' issuance of stock to employees without shareholder approval:

> On December 9, 2014, Retrophin, Inc. (the "*Company*") received a letter from The Nasdaq Stock Market LLC ("*Nasdaq*") indicating that Nasdaq has determined that the Company has failed to comply with the shareholder approval requirement of Nasdaq Listing Rule 5635(c), related to the Company's grant of stock options and restricted stock to employees from February 24, 2014 through August 18, 2014 (the "*Equity Awards*"). The Equity Awards were previously disclosed by the Company as inducement awards in a press release dated October 3, 2014. Upon review of the Equity Awards, Nasdaq has determined that the Equity Awards did not satisfy all of the criteria to qualify as inducement

awards. Under applicable Nasdaq rules, the Company has 45 calendar days to submit a plan to regain compliance with all of the Nasdaq listing requirements. The Company has been in contact with Nasdaq since its receipt of the letter and has developed a plan to regain compliance, which it intends to submit to Nasdaq promptly. If the plan is accepted, Nasdaq can grant the Company an extension of up to 180 calendar days from December 9, 2014 to evidence compliance.

137.   According to a January 7, 2015 Bloomberg article entitled, *Retrophin Founder Said Probed over Securities Dealings*, "Shkreli also faces a probe by the U.S. Securities and Exchange Commission, according to the person, who requested anonymity because the investigation isn't public."

138.   On January 23, 2015, the Company filed a Definitive Proxy Statement for a special meeting of Retrophin's stockholders on Form DEF14A with the SEC, admitting to these stock grant irregularities. The Proxy described the vote as follows:

> The proposal to be voted on is the ratification of the Company's prior issuance of stock options to purchase 1,928,000 shares of common stock and 230,000 restricted shares of common stock granted to employees between February 24, 2014 and August 18, 2014, as required pursuant to the Listing Rules of the Nasdaq Stock Market LLC ("Nasdaq"), in order to allow the Company to regain compliance with such Nasdaq Listing Rules. You may find information about this proposal beginning on page 5 of this proxy statement.

Moreover, according to the Proxy Statement, the Company issued these stock options without stockholder approval:

> Between February 24, 2014 and August 18, 2014, the Company issued to employees of the Company stock options to purchase 1,928,000 shares of the Company's common stock (the "Options") and 230,000 shares of restricted common stock (the "Restricted Stock" and together with the Options, the "Equity Awards") without stockholder approval. A detailed description of each Equity Award is set forth on **Appendix A** to this Proxy Statement.[3] Believing that the Equity Awards acted as an inducement material to persons entering into employment with the Company, and therefore qualified as "inducement awards", the Company disclosed the Equity Awards as "inducement awards" in a press release issued on October 3, 2014.

---

[3] Appendix A to the Proxy Statement is attached as Exhibit A hereto.

On December 9, 2014, the Company received a letter from Nasdaq indicating that Nasdaq determined that the Company did not comply with the stockholder approval requirement of Listing Rule 5635(c), related to the Company's grant of the Equity Awards. Upon review of the Equity Awards, Nasdaq determined that the Equity Awards did not satisfy all of the criteria to qualify as "inducement awards".

In order to regain compliance with Listing Rule 5635(c), we have submitted this proposal to our stockholders for approval in order to ratify the Company's prior issuance of the Equity Awards. Ratification of the Equity Awards at the Special Meeting is part of a plan of compliance that the Company previously submitted to, and which was subsequently approved by, Nasdaq.

139.    On February 3, 2015, the Company issued a press release announcing that the Company's stockholders voted to approve a proposal ratifying the prior issuance of stock options to purchase 1,928,000 shares of common stock and 230,000 restricted shares of common stock granted to employees between February 24, 2014 and August 18, 2014. Moreover, the press release indicated that "[t]he proposal described above was submitted for approval at the Special Meeting of Stockholders in order for Retrophin to regain compliance with Nasdaq Listing Rule 5635(c). Following the approval of the proposal at the Special Meeting of Stockholders, Retrophin believes that it has satisfied its obligations under the plan of compliance previously approved by Nasdaq."

140.    On February 11, 2015, at the 2015 Leerink Global Healthcare Conference in New York, New York, the Company's new CEO, Stephen Aselage, announced that Retrophin had hired two new Board members, a General Counsel and a Chief Compliance Officer, and head of human resources. According to Aselage, "we also knew that we had some gaps; there were positions that needed to be upgraded or filled."

141.    On February 20, 2015, in a Form 8-K filed with the SEC, the Company disclosed that the Oversight Committee appointed by the Board of Directors to investigate stock irregularities surrounding Defendant Shkreli confirmed the existence of inappropriate

transactions between him and former investors. Specifically, the Oversight Committee concluded as follows:

- Consulting Agreements. Between September 2013 and March 2014, the Company entered into several consulting agreements and releases with individuals or entities that had been investors in investment funds previously managed by Mr. Shkreli (the "MSMB Entities"), or that otherwise had financial dealings with Mr. Shkreli. The agreements provided for the issuance of a total of 612,500 shares of common stock of the Company, and a total of $400,000 in cash payments by the Company. The Oversight Committee concluded that the Company should not continue to treat these agreements as consulting agreements because their predominant purpose appears to have been to settle and release claims against the MSMB Entities or Mr. Shkreli personally, and not to provide meaningful and sustained consulting services to the Company.

- Settlement Agreements. As previously disclosed, in the second quarter of 2013 the Company entered into a series of settlement agreements with individuals or entities that had been investors in the MSMB Entities, pursuant to which the Company paid approximately $2.2 million in cash and issued 11,000 shares of common stock of the Company to such investors, and Mr. Shkreli delivered or caused to be delivered a total of 47,128 shares of common stock of the Company to one such investor. The Oversight Committee concluded that an additional previously disclosed settlement agreement entered into by the Company (and under which the Company paid $300,000 in cash) was also with a former investor in the MSMB Entities, and that the predominant purpose of this payment was to settle and release the investor's claims against the MSMB Entities and Mr. Shkreli personally. The Oversight Committee also concluded that Mr. Shkreli caused to be delivered an additional 80,000 shares of common stock of the Company to another former investor in the MSMB Entities pursuant to a previously undisclosed settlement agreement to which the Company was a party.

- Litigation Settlements. In the second quarter of 2014, the Company settled two lawsuits involving individuals who had formerly performed services for both the Company and the MSMB Entities. The Oversight Committee concluded that approximately $200,000 in cash payments made by the Company as part of these settlements appear to have been made to cause these individuals to transfer 176,388 shares of the Company's common stock directly to Mr. Shkreli.

- Other Obligations. During the quarter ended March 31, 2013, the Company repaid a $900,000 secured promissory note dated February 1, 2012, together with interest thereon, in favor of one of the MSMB Entities. The Oversight Committee concluded that the MSMB Entity originally transferred the $900,000 to the Company as an equity investment, which was subsequently reclassified as a loan. It appears that $900,000 of the Company's payment against the note, together with a $575,000 payment made by the Company to Mr. Shkreli (which appears to have been a discretionary bonus), was transferred to a third party in connection with the settlement of an arbitration proceeding brought against one of the MSMB Entities and Mr. Shkreli personally. The Oversight Committee also identified other instances in which the Company paid or forgave

monetary obligations of approximately $1.2 million in the aggregate for the primary benefit of the MSMB Entities.

142.    Moreover, the February 20th 8-K revealed that "the Company's Form 10-Q for the three months ended September 30, 2013 (the '2013 Q3 Form 10-Q'), the Company's Form 10-K for the year ended December 31, 2013 (the '2013 Form 10-K') and the Company's Forms 10-Q for the quarters ended March 31, 2014, June 30, 2014 and September 30, 2014 (the '2014 Forms 10-Q') contain errors" related to these consulting agreements. Therefore, the Company concluded that the financial statements contained in the 2013 Q3 Form 10-Q and the 2013 Form 10-K should no longer be relied upon, which will be corrected in the Company's forthcoming Form 10-K for year-end 2014.

143.    In addition, according to the same filing, "[t]he Oversight Committee is evaluating the Company's alternatives with respect to the matters identified by the Oversight Committee, which may include asserting claims for damages against one or more parties who engaged in the conduct covered by the Investigation."

144.    The filing also disclosed that "[i]n January 2015, the Company received a subpoena relating to a criminal investigation by the U.S. Attorney for the Eastern District of New York. The subpoena requests information regarding, among other things, the Company's relationship with the MS MB Entities and Mr. Shkreli."

145.    That same day, February 20, 2015, Defendant Shkreli posted a public response to the Form 8-K on Twitter and InvestorsHub, stating in relevant part, "This is Martin Shkreli. The 8-k is completely false, untrue at best and defamatory at worst. I am evaluating my options to respond. Every transaction I've ever made at Retrophin was done with outside counsel's blessing (I have the bills to prove it), board approval and made good corporate sense. I took Retrophin from an idea to a $500 million public company in 3 years--and I had a lot of help along the way."

146.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### ADDITIONAL SCIENTER ALLEGATIONS

147.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Retrophin, their control over, and receipt of modification of the Company's allegedly materially misleading misstatements and their associations with the Company which made them privy to confidential proprietary information concerning Retrophin, participated in the fraudulent scheme alleged herein. In addition, Individual Defendants knew, or recklessly disregarded, the existence of the stock award grants without shareholder approval, as well as the improper and undisclosed related party transactions entered into by the Company.

148.    The Compensation Committee defendants, including Defendants Richardson, Aselage and Golding, had a duty to pay special attention to stock awards because the Committee was charged with construing and interpreting the compensation Plan and promulgating, amending and rescinding rules and regulations relating to the implementation, administration and maintenance of the Plan. The Compensation Committee also was charged with selecting the Plan's participants, making awards in amounts and forms as deemed advisable, imposing restrictions, terms and conditions as deemed appropriate, and correcting any technical defects or inconsistencies in the Plan or any agreement made thereunder.

149.    Specifically, Defendant Shkreli had actual knowledge of the material misstatements and omissions, as he is the individual who personally directed and orchestrated the stock award grants without shareholder approval, as well as the improper and undisclosed related party transactions entered into by the Company. As a beneficiary of the alleged related party transactions, Shkreli had actual knowledge of them. Shkreli also was involved in deciding which

disclosures would be made by the Company. Shkreli was a "hands-on" manager, overseeing Retrophin's operations and finances, and making the materially false and misleading statements described herein.

150.    Defendant Shkreli had a strong motivation to keep Retrophin's stock price inflated because, during the Class Period, he sold almost $15 million worth of Retrophin stock while in possession of material, inside information not known to the investing public. Shkreli sold *no* stock prior to his first insider sale of 292,400 shares on May 30, 2014.

151.    Moreover, Defendant Shkreli's insider selling during the Class Period substantially augmented his base salary. Shkreli's base salary was $237,500 for 2014 and $252,091 for 2013—his stock sales generated proceeds of almost **200 times** his annual salary.

152.    In addition, the other Individual Defendants, Panoff, Paley, Richardson, Aselage, and Golding, were aware of or recklessly ignored glaring red flags present (detailed *supra*) during the Class Period that should have alerted them to the violations alleged herein.

153.    Defendants also were motivated to keep the price of Retrophin's common stock artificially inflated in order to comply with and facilitate debt and revolving loan agreements, to facilitate the issuance of new stock options, and to facilitate the Company's acquisition of Kyalin Biosciences, Inc.

154.    On December 23, 2013, Retrophin acquired Kyalin Biosciences Inc. from Dr. Srinivas Rao, who subsequently served as Retrophin's Senior Vice President and Head of Neuroscience. According to the Company's Form 8-K filed on December 30, 2013, "the Company agreed to pay to the Sellers (i) certain cash consideration at specified dates; and (ii) shares of the Company's common stock, par value $0.0001 per share ('Common Stock') at certain dates and upon the achievement of certain milestones. Under certain limited

circumstances, the Company would be required to pay to the Sellers, in the place of such shares of Common Stock, an amount of cash equal to one-half (1/2) of the value of the shares of Common Stock issuable in accordance with the Stock Purchase Agreement."

155.    On May 29, 2014, the Company announced that it signed a binding commitment on a $40 million senior secured term loan facility, provided by Athyrium Capital Management. The term loan matures in 2018, with an interest rate of LIBOR plus 10% (with a LIBOR floor of 1%). The lender received warrants to purchase an aggregate of 300,000 shares of common stock for a period of five years at an exercise price of $13.93 per share. In addition, the Company also entered into definitive purchase agreements with a group of institutional investors for the purchase and sale of $40 million of 4.5% Senior Convertible Notes due 2019. The Notes are convertible into shares of the Company's common stock at an initial conversion rate of 57.43 shares of common stock per $1,000 principal amount of Notes, equivalent to an initial conversion price of approximately $17.41 per share of common stock, subject to adjustment in certain circumstances. The Notes mature on May 30, 2019.

156.    Finally, at a minimum, Plaintiff has alleged corporate scienter as to Retrophin as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the Company's operations, business practices, compensation plan, and compliance with NASDAQ listing requirements—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

157. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Retrophin securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

158. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Retrophin securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Retrophin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

159. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

160. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

161.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Retrophin;

- whether the Individual Defendants caused Retrophin to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Retrophin securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

162.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

163.    Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

164. In the alternative, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Retrophin securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Retrophin securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

165. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market or a presumption of reliance under *Affiliated Ute*.

## <u>COUNT I</u>

### (Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder Against All Defendants)

166. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

167. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

168.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Retrophin securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Retrophin securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

169.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Retrophin securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Retrophin's stock granting practices.

170.    By virtue of their positions at Retrophin, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

171.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Retrophin securities from their personal portfolios.

172.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Retrophin, the Individual Defendants had knowledge of the details of Retrophin's internal affairs.

173.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Retrophin. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Retrophin's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Retrophin securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Retrophin's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or

otherwise acquired Retrophin securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

174. During the Class Period, Retrophin securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Retrophin securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Retrophin securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Retrophin securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

175. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

176. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT III

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

177.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

178.    During the Class Period, the Individual Defendants participated in the operation and management of Retrophin, and conducted and participated, directly and indirectly, in the conduct of Retrophin's business affairs. Because of their senior positions, they knew the adverse non-public information about Retrophin's misstatement of income and expenses and false financial statements.

179.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Retrophin's financial condition and results of operations, and to correct promptly any public statements issued by Retrophin which had become materially false or misleading.

180.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Retrophin disseminated in the marketplace during the Class Period concerning Retrophin's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Retrophin to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Retrophin within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Retrophin securities.

181.    Each of the Individual Defendants, therefore, acted as a controlling person of Retrophin. By reason of their senior management positions and/or being directors of Retrophin,

each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Retrophin to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Retrophin and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

182.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Retrophin.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  March 3, 2015

Respectfully submitted,

**POMERANTZ LLP**

_/s/ Murielle J. Steven Walsh_
Jeremy A. Lieberman
Murielle J. Steven Walsh
Francis P. McConville
Star Mishkel Tyner
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
mjsteven@pomlaw.com
fmcconville@pomlaw.com
smtyner@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

**_Attorneys for Plaintiff_**