# POMERANTZ LLP

**Murielle J. Steven Walsh**  
mjsteven@pomlaw.com

600 Third Avenue, 20th Floor  
New York, New York 10016  
T: 212.661.1100   F: 212.661.8665

May 19, 2015

**VIA ECF:**
Honorable P. Kevin Castel
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street – Courtroom 11D
New York, NY 10007-1312

    Re:   *In re Retrophin, Inc. Securities Litigation*, No. 1:14-cv-08376

Dear Judge Castel:

    We represent lead plaintiff Grachya Kazanchyan ("Plaintiff") in the above-captioned action. We write to respond to the May 5th pre-motion letters filed by Defendants Retrophin, Martin Shkreli, Mark L. Panoff, Jeffrey Paley[1] and the Current Director Defendants (Steve Aselage, Steve Richardson, and Neil Golding) (Dkt. Nos. 27, 29-31) regarding their proposed motions to dismiss the First Amended Consolidated Complaint (Dkt. No. 18) (the "FACC").[2]

    Defendants cannot reasonably dispute that Retrophin's SEC filings and other public statements during the Class Period omitted material facts that Defendants were duty-bound to disclose—especially where the Company eventually was forced to disclose those facts to the detriment of investors. Specifically, Defendants concealed (i) the improper grant of millions of shares to various Company employees and "consultants" without shareholder approval and in violation of NASDAQ regulations, and (ii) millions of dollars' worth of sham settlement and consulting agreements that were, in fact, related party transactions designed to personally benefit Shkreli and his former hedge fund, MSMB Capital Management ("MSMB"). ¶ 5. Accordingly, Defendants' letters focus almost entirely on the elements of loss causation and scienter.

**The FACC Sufficiently Alleges Loss Causation.**

    Loss causation is not subject to the heightened pleading standards of Rule 9(b) or the PSLRA. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 469 (S.D.N.Y. 2013); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010) ("Loss causation need not be pled with particularity."). Instead, a short and plain statement suffices, as required under Rule 8. There are several possible methods of pleading loss causation, including direct causation, materialization of risk, and corrective disclosure. Thus, "[w]here the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss," a plaintiff may

---

[1] Plaintiff has agreed in principle to dismiss Defendant Paley without prejudice. Therefore, this letter does not address the individual arguments made in Paley's pre-motion letter (Dkt. No. 29).

[2] Due to space constraints, Plaintiff responds only to the primary arguments raised by Defendants' letters, without waiving his right to advance additional arguments in response to any motions to dismiss.

plead that it is "the materialization of the undisclosed condition or event that causes the loss." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008).

Here, the FACC alleges a series of news reports and announcements that gradually revealed the truth to the market and caused the stock price to decline. On September 13, 2013, the Company filed an Amended Form 10-K ("Amended 10-K") revealing restated 2012 financial results to account for certain "settlement agreements" involving related parties. ¶ 119. The stock price fell over 5% in response to this news. ¶ 120. On April 4, 2014, Retrophin unexpectedly announced the termination of its auditor, Marcum LLP. ¶ 121. Retrophin stock fell $1.04, another 5%, on the next trading day. ¶ 122. Subsequently, a May, 28, 2014 *Seeking Alpha* report highlighted the fact that Retrophin expended $3 million in Company money to settle legal liabilities for MSMB, and also revealed that the Company's predecessor was controlled by an individual tied to fraudulent companies. ¶ 123. The Company's stock price fell over 7% in response to this article. ¶ 124.

On September 16, 2014, the Company disclosed the sudden resignation of its CFO, Defendant Panoff, and director Paley, causing the stock to fall over 8%. ¶¶ 125-26. Just a week later, on September 26, 2014, a *Seeking Alpha* article highlighted numerous red flags about the Company, including Shkreli's highly erratic behavior, causing another 8% price decline. ¶¶ 127-28.

Just weeks later, on September 30, 2014, the Company announced Shkreli's termination. ¶ 129. Investors correctly perceived this news as confirmation of serious problems at the Company, driving the stock price down another 4.5%. ¶ 130. News reports in the days that followed (October 2nd and October 6th) revealed the reasons for Shkreli's termination, *i.e.*, grants of Retrophin stock without shareholder approval, failures to disclose stock grants and alleged securities violations. ¶¶ 132, 134. Retrophin shares dropped approximately 15% in the week that followed (from $11.00 on October 6, 2014 to $9.34 on October 13, 2014). ¶ 135.

Contrary to Defendants' suggestion, loss causation does not require "a single, unitary disclosure," but instead, can be pled, as here, through "a series of disclosing events." *In re Bradley Pharm., Inc. Sec. Litig.*, 421 F. Supp. 2d 822, 828-29 (D.N.J. 2006); *Freeland v. Iridium World Commc'ns, Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) (noting that "reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures").

Defendants also incorrectly argue that executive and auditor resignations cannot support loss causation. Loss causation does not require that "a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010); *In re Initial Pub. Offering*, 544 F. Supp. 2d at 289 ("[T]here is no requirement that the disclosure take a particular form or be of a particular quality."); *see also In re Enron Corp. Sec., Derivative & "Erisa" Litig.*, No. MDL-1446, 2005 WL 3504860, at *16 (S.D. Tex. Dec. 22, 2005) ("[B]esides a formal corrective disclosure by a defendant followed by a steep drop in the price of stock, the market may learn of possible fraud [from] a number of sources: e.g., from whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc.").

Shkreli's termination, and the other officer/director departures, represented materialization of the risks that had been previously undisclosed. By all accounts, Shkreli's departure was directly tied to his previously undisclosed improper conduct. Thus, these disclosures fell within the "zone of risk" concealed by Defendants' omissions of the stock option grants and related party deals, which satisfies loss causation. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) ("[A] misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged…."); *see also Freudenberg*, 712 F. Supp. 2d at 202 ("A risk allegedly concealed by defendants which materialized and arguably caused the decline in shareholder value suffices."). By the time Retrophin itself disclosed the full extent of Defendants' misconduct to investors, it was merely confirming the material risk that investors had anticipated from earlier disclosures.

Similarly, in *Public Employees' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322-25 (5th Cir. 2014), the plaintiffs relied on executive resignations and a report speculating on Medicare fraud, as well as disclosures of government investigations and disappointing earnings. As a result of these disclosures, the plaintiffs argued that "the truth gradually leaked into the market," causing significant stock price declines. *Id.* at 317-18. The defendants there also argued that none of the disclosures standing alone were sufficient to establish loss causation. *Id.* The Fifth Circuit, however, found that the disclosures should not be analyzed in isolation, and that the disclosures "collectively constitute and culminate in a corrective disclosure that adequately pleads loss causation…." *Id.* at 324.[3]

Further, as already noted, the FACC alleges stock price declines in response to several news reports and articles. Though Defendants suggest that news articles and internet posts are insufficient to support loss causation, numerous courts have rejected this argument. *See In re Winstar Commc'ns*, No. 01 CV 11522, 2006 WL 473885, at *1 (S.D.N.Y. Feb. 27, 2006) (finding that a short-seller report supported loss causation because *Dura* "did not address the means by which the information is imparted to the public" nor impose "any requirement that the disclosure take a particular form or be of a particular quality"); *In re Tommy Hilfiger Sec. Litig.*, No. 04-civ-7678, 2007 WL 5581705, at *3 (S.D.N.Y. July 20, 2007) ("[P]laintiff must establish that his losses were attributable to *some form* of revelation to the market of the wrongfully concealed information.") (emphasis added) (quotation omitted).

Defendants also dispute loss causation because the stock price rose after some of the disclosures—for example, the October 2, 2014 Bloomberg article (citing stock irregularities as a reason for Shkreli's dismissal), and the January 23, 2015 proxy statement (admitting formally to the improper stock option grants). However, as *Amedisys* correctly found, the alleged disclosures in the FACC should be viewed collectively and not in isolation. When viewed in light of the overall decline in the stock price and numerous stock drops in response to negative news related to the Company's previous omissions, loss causation is clearly evident here.

---

[3] Defendants' reliance on *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, 645 F. Supp. 2d 210 (S.D.N.Y. 2009) is misplaced. There, the court noted that the announcement of an executive's departure "was not tied to any fraud, omission, or misstatement, and it certainly made no reference to stock-options backdating or to revenue recognition irregularities." *Id.* at 229. Here, by contrast, news reports promptly confirmed that Shkreli's departure was directly related to the previously undisclosed stock trading irregularities.

**The FACC Sufficiently Alleges Scienter as to All Defendants.**

Scienter "can be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000) (quotation omitted). Plaintiffs' allegations must be viewed collectively and not "scrutinized in isolation." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007); *see also id.* at 2511 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Where an inference of scienter is at least "equally as compelling as any alternative inference," the "*tie favors the plaintiff.*" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (emphasis added).

The allegations of the FACC raise a strong inference that Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quotation omitted). Defendant Shkreli's arguments against scienter are particularly weak. The inference that Shkreli was aware of the material omissions is not just compelling—it is inescapable. The Company's own statements clearly show that the related party transactions benefited Shkreli and his former hedge fund, MSMB. *See* ¶ 51. While Shkreli claims that the FACC relies solely on group pleading and news reports to raise an inference of scienter, in fact, the Company's February 20th 8-K attributes the negotiation of the related party deals directly to Shkreli.[4] Shkreli also personally orchestrated the stock award grants without shareholder approval. Further probative of scienter is the fact that Shkreli and MSMB are under criminal investigation by the U.S. Attorney for the Eastern District of New York. ¶ 144. Against this evidence, Shkreli's reliance on his own self-serving statements that he had Board and counsel approval for the transactions does not outweigh the strong inference of scienter. ¶ 145.

The Current Director Defendants' arguments against scienter are equally unavailing. Each of these Defendants served on the Compensation Committee, which was specifically charged with the duty to make appropriate stock awards and otherwise monitor them. ¶ 148. Thus, these Defendants knew facts or had access to information regarding Shkreli's improper stock award grants. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("[I]f facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should have known of them.").

The Current Director Defendants' claim that the improper issuance of the stock option grants without shareholder approval was merely a "mistake" raises factual questions not appropriate on a motion to dismiss. Indeed, the inference that this was mere negligence is weak, given the basic nature of the underlying issue. The Company initially disclosed the existence of the grants on October 3, 2014, even though the first grant was issued months earlier, in February 2014. ¶ 41. Even when disclosing them, Defendants' initial characterization of the grants as "inducement wards" had no apparent basis in fact, given that the stock was granted to current

---

[4] This fact also negates Shkreli's argument that scienter is undercut because some of the related party transactions were revealed in the Amended 10-K. In fact, the whole truth regarding the improper arrangements was not revealed until the Company conducted an investigation and summarized its results in the February 20th 8-K.

employees of the Company. By definition, an inducement award applies only to grants extended to prospective employees, to induce them to accept employment. ¶ 39.

Defendants focus heavily on their lack of motive, but motive is not required to allege scienter. *See, e.g.*, *Freedman v. Weatherford Int'l Ltd.*, No. 12 Civ. 2121, 2013 WL 5299137, at *5 n.46 (S.D.N.Y. Sept. 20, 2013) (relying solely on circumstantial evidence of recklessness to deny motion to dismiss, as opposed to motive and opportunity). Nonetheless, Defendant Shkreli had strong motives to engage in improper conduct, effectively using Retrophin money to pay off his MSMB liabilities. The related party transactions released Shkreli and MSMB from litigation and arbitration claims brought against them—claims unrelated to Retrophin. In addition, Shkreli sold significant amounts of Retrophin stock during the Class Period—almost $15 million worth—while in possession of material, inside information not known to the investing public. ¶ 150. Insider stock sales support an inference of scienter where, as here, they are "unusual" in timing or amount. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001).

The other individual Defendants knew or recklessly disregarded Shkreli's propensity to use Retrophin to settle his legal liabilities. ¶ 67. At the very least, Defendants ignored this and other red flags that should have alerted them to the improper stock grants and related-party transactions. *See* ¶¶ 60-79 (detailing red flags including deficient internal controls, Shkreli's powerful ownership position, news sources questioning potential problems at Retrophin, prior investigations of Shkreli for stock manipulation, termination of Retrophin's independent auditor, ongoing litigation, and restatements during the Class Period). As Retrophin's CFO, Defendant Panoff—absent extreme recklessness—must have known about the Company's related-party transactions and the personal benefit provided to Shkreli and the improper stock transactions that manifestly violated the Company's incentive compensation plan.

Finally, the FACC alleges institutional scienter because "the pleaded facts [] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Penn. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012) (citation omitted). Here, the statements alleged were made to the investing public regarding important topics that would necessarily require approval by appropriate corporate officers who had very different information in their hands at the time. ¶ 156. Thus, corporate knowledge of the improper transactions raises a strong inference of corporate scienter as to Retrophin itself.

Based on the foregoing, Plaintiff intends to stand on the FACC (with the exception of dismissing Defendant Paley without prejudice). If the Defendants do file their intended motions, Plaintiff is amenable to the briefing schedule proposed by Defendant Retrophin—*i.e.*, Defendants' motion(s) to dismiss due on or before July 20, 2015; (2) Plaintiff's opposition due on or before September 3, 2015; and (3) Defendants' replies due on or before October 3, 2015.

                                           Respectfully submitted,

                                           */s/ Murielle J. Steven Walsh*
                                           Murielle J. Steven Walsh

cc: All counsel of record via ECF