**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Retrophin, Inc. Securities Litigation | **1:14-cv-08376-PKC** <br><br> **CLASS ACTION** |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

**POMERANTZ LLP**
Jeremy A. Lieberman
Murielle J. Steven Walsh
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: 212-661-1100
Facsimile: 212-661-8665

*Lead Counsel for Plaintiffs*

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT .................................................................................. 1

II.    FACTUAL BACKGROUND .................................................................................... 2

III.   PROCEDURAL HISTORY ...................................................................................... 5

IV.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL........... 6

    A.     Standards for Preliminary Approval .......................................................... 7

    B.     The Proposed Settlement Merits Preliminary Approval ........................................ 8

    C.     The Applicable Factors Support Preliminary Approval ...................................... 10

        1.     Risks of Establishing Liability & Damages/Complexity, Expense, and Likely Duration of the Litigation ................................................... 11

        2.     Stage of Proceedings and Amount of Discovery Completed.................... 12

        3.     The Risks of Maintaining the Class Action through Trial ....................... 13

        4.     Reasonableness of the Settlement .............................................. 14

V.     CERTIFICATION OF THE CLASS IS APPROPRIATE ............................................. 15

    A.     The Proposed Settlement Class Satisfies Rule 23(a) ........................................ 15

    B.     The Proposed Settlement Class Satisfies Rule 23(b) ........................................ 16

VI.    THE PROPOSED FORM AND METHOD OF NOTICE IS APPROPRIATE ............... 17

VII.   PROPOSED SCHEDULE OF EVENTS ................................................................. 19

VIII.  CONCLUSION ................................................................................................ 19

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Pages**

*Affiliated Ute Citizens of Utah v. United States*,
   406 U.S. 128 (1972)...................................................................................................... 14

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997)...................................................................................................... 17

*Booth v. Strategic Realty Trust, Inc.*,
   No. 13-cv-04921-JST, 2015 U.S. Dist. LEXIS 140723 (N.D. Cal. Oct. 15, 2015)................... 9

*Carson v. Am. Brands, Inc.*,
   450 U.S. 79 (1981)........................................................................................................ 7

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974) ...................................................................................... 9, 10

*Consolidated Raid Corp. v. Town of Hyde Park*,
   47 F.3d 473 (2d Cir. 1995) ........................................................................................... 15

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001) ........................................................................................... 10

*Fleisher v. Phoenix Life Ins. Co.*,
   Nos. 11-cv-8405, 14-cv-8714, 2015 U.S. Dist. LEXIS 121574 (S.D.N.Y. Sept. 9, 2015) ........ 7

*Fogarazzo v. Lehman Bros., Inc.*,
   232 F.R.D. 176 (S.D.N.Y. 2005) ................................................................................... 16

*Goodman v. Genworth Fin. Wealth Mgmt.*,
   300 F.R.D. 90 (E.D.N.Y. 2014)..................................................................................... 14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   134 S.Ct. 2398 (2014)......................................................................................... 13, 14, 17

*In re Austrian & German Bank Holocaust Litig.*,
   80 F. Supp. 2d 164 (S.D.N.Y. 2000) ............................................................................. 13

*In re Crazy Eddie Sec. Litig*,
   824 F. Supp. 320 (E.D.N.Y. 1993) ................................................................................. 9

*In re Marsh Erisa Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ................................................................................... 18

*In re Rio Hair Naturalizer Prods. Liab. Litig.*,
   MDL No. 1055, 1996 WL 780512 (E.D. Mich. Dec. 20, 1996)............................................ 13

*In re Rite Aid Corp. Sec. Litig.*,
   146 F. Supp. 2d 706 (E.D. Pa. 2001) .............................................................................. 9

*In re Smith Barney Transfer Agent Litig.*,
   290 F.R.D. 42 (S.D.N.Y. 2013) ..................................................................................... 14

*Mangone v. First USA Bank,*
    206 F.R.D. 222 (S.D. Ill. 2001) ........................................................ 18

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.,*
    552 U.S. 148 (2008) ..................................................................... 14, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ........................................................................ 11

*Thompson v. Metro. Life Ins. Co.,*
    216 F.R.D. 55 (S.D.N.Y. 2003) ........................................................ 10

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
    396 F.3d 96 (2d Cir. 2005) ................................................................ 7

*Weinberger v. Kendrick,*
    698 F.2d 61 (2d Cir. 1982) .............................................................. 15

## Statutes

15 U.S.C. § 77z-1(b) .................................................................................. 11

15 U.S.C. §§ 78j(b); 78t(a) .......................................................................... 2

15 U.S.C. § 78u-4(a)(7) ............................................................................. 18

## Rules

Fed. R. Civ. P. 23 ................................................................................ *passim*

## Regulations

17 C.F.R. § 229.404 .............................................................................. 3, 17

17 C.F.R. § 240.10b-5 ............................................................................... 3

## Other Authorities

Cornerstone Research, *Securities Class Action Settlements: 2014 Review and Analysis* (2015),
    https://www.cornerstone.com/GetAttachment/701f936e-ab1d-425b-8304-
    8a3e063abae8/Securities-Class-Action-Settlements-2014-Review-and-Analysis.pdf .............. 9

Manual for Complex Litigation (Fourth) (2004) ............................................ 7

Manual for Complex Litigation (Third) (1995) ............................................. 8

William Rubenstein, Alba Conte, & Herbert B. Newberg,
    *Newberg on Class Actions* (4th ed. 2002) ........................................ 7

## I.     PRELIMINARY STATEMENT

Lead Plaintiff Grachya Kazanchyan, through his counsel, on behalf of himself and the Class, seeks preliminary approval of the proposed settlement set forth in the Stipulation of Settlement dated January 29, 2016 (the "Stipulation"), resolving this Action against all Defendants in exchange for a payment of $3.0 million for the benefit of the Class.[1] Lead Plaintiff respectfully requests that the Court enter an order (the "Preliminary Approval Order"): (1) preliminarily approving the proposed settlement set forth in the Stipulation; (2) preliminarily certifying a class (the "Class"), for settlement purposes only, of all persons who purchased or otherwise acquired the securities of Retrophin, Inc. ("Retrophin") between June 13, 2013 and September 30, 2014, both dates inclusive (the "Class Period"); (3) appointing Strategic Claims Services as Claims Administrator; (4) approving the form and manner of disseminating notice to the Class; (5) scheduling a hearing to consider final approval of the Settlement and an award of attorneys' fees and expenses; and (6) setting deadlines for the dissemination of notice, the submission of proofs of claim and requests for exclusion, and the filing of objections and papers in support of the settlement.

While the factual merits of Plaintiffs' case are strong, the proposed settlement is an excellent result in light of the risk, expense, and uncertainty of prosecuting this litigation through trial. Based on a thorough examination of the claims and allegations in this action and an analysis of estimated damages, Lead Counsel believes the proposed settlement is fair, reasonable, adequate, and in the best interests of the Class. Accordingly, Plaintiffs request preliminary approval so that notice of the proposed settlement may be disseminated to the Class.

---

[1] The Stipulation is attached to the Declaration of Murielle J. Steven Walsh as Exhibit A. All capitalized terms used herein are defined in the Stipulation.

## II.    FACTUAL BACKGROUND

This is a federal securities class action against Retrophin and five of its former directors/officers: (1) Martin Shkreli, who founded Retrophin, served on Retrophin's Board of Directors ("Retrophin's Board"), and served as CEO until his termination on September 30, 2014; (2) Marc L. Panoff, who served as CFO until his termination on September 15, 2014, effective as of February 28, 2015; (3) Steve Richardson, who served on Retrophin's Board as chairman of the Compensation and Talent Development Committee ("Compensation Committee") at all relevant times; (4) Stephen Aselage, who served on Retrophin's Board and was a member of the Compensation Committee; and (5) Cornelius E. Golding, who served on Retrophin's Board beginning on October 1, 2013 and was a member of the Compensation Committee at all relevant times.[2]

Retrophin is a pharmaceutical company that focuses on developing, acquiring, and commercializing treatments for serious, catastrophic, and/or rare diseases. It was founded in 2011 by Shkreli, a biotech entrepreneur who had previously founded and managed the hedge fund MSMB Capital Management ("MSMB"). In December 2012, when Retrophin began trading publicly[3], *Forbes* described the 29-year-old Shkreli as "best known to investors as an activist who battled billionaires and entrenched drug industry executives through blog posts, shareholder letters, regulatory filings, and even an attempted hostile takeover." Compl. ¶ 3.

In this action, Lead Plaintiff asserts claims against Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and

---

[2]    Jeffrey Paley, a former Retrophin director, was voluntarily dismissed without prejudice on May 26, 2015.

[3]    Retrophin common stock began trading publicly in December 2012 on the Over the Counter QB market. On January 10, 2014, it began trading on the NASDAQ Global Market. At all relevant times, it traded under the symbol "RTRX."

§78t(a), and SEC Rule 10b-5, 17 C.F.R. §240.10b-5. Specifically, Lead Plaintiff alleges two cat-egories of misrepresentations and/or omissions.

First, Defendants failed to disclose related-party transactions worth millions of dollars that directly benefitted Shkreli and MSMB, in violation of Item 404 of Regulation S-K, 17 C.F.R. § 229.404, which requires such disclosures. As Retrophin later detailed to investors on February 20, 2015, these related-party transactions included:

- Sham "consulting agreements," providing for Retrophin to issue 612,500 shares of com-mon stock and pay $400,000 in cash to "individuals or entities that had been investors in investment funds previously managed by Mr. Shkreli . . . or that otherwise had financial dealings with Mr. Shkreli," whose predominant purpose was to settle legal claims against MSMB or Shkreli personally, not to procure meaningful consulting services for Retro-phin;

- A previously-undisclosed settlement agreement, pursuant to which Shkreli caused 80,000 Retrophin shares to be delivered to a former MSMB investor;

- A settlement agreement dated August 29, 2013, which Retrophin had previously de-scribed simply as "an additional settlement agreement for $300,000,"[4] that was in fact for the predominant purpose of settling a former MSMB investor's claims against MSMB and Shkreli personally;

- Two settlement agreements with individuals who had performed services for both Retro-phin and MSMB, pursuant to which Retrophin ended up paying $200,000 in exchange for their transferring 176,000 Retrophin shares directly to Shkreli; and

---

[4]     Retrophin, Inc. Form 10-Q for the second quarter of 2013, filed Sep. 16, 2013, at 9.

- Other payments and forgiven debt, worth more than $2 million in the aggregate, that were for the primary benefit of MSMB.

Retrophin, Inc. Form 8-K, filed Feb. 20, 2015, at 2; Compl. ¶¶ 141–45.

Second, contrary to Defendants' representations of Retrophin's Compensation Committee's compliance with NASDAQ listing requirements, Retrophin made improper stock grants to employees without shareholder authorization, in violation of NASDAQ listing requirements mandating shareholder approval of all equity-compensation plans and material amendments thereto. Between February 24, 2014 and August 18, 2014, these grants totaled 230,000 shares of restricted common stock and call options for 1,928,000 shares of common stock. Compl. ¶¶ 34–46, 103–05. Shareholders had no idea these awards were made until early October 2014, when news reports began to attribute Shkreli's September 30, 2014 termination to stock irregularities, including the improper grant of stock awards. Compl. ¶ 40. Although Retrophin hastily claimed that the improper stock grants were "inducement awards" exempt from shareholder approval, NASDAQ promptly rebuffed this contention, and Retrophin was ultimately forced to seek retroactive shareholder ratification. Compl. ¶¶ 42–45, 136–38.

Lead Plaintiff further alleges that investors were harmed when the truth was revealed through a series of partial corrective disclosures, beginning with Retrophin's restatement on September 13, 2013 to account for related-party transactions benefitting Shkreli, and continuing through October 6, 2014, when news reports revealed that Shkreli had been ousted from Retrophin for stock-trading irregularities and other improprieties. Compl. ¶¶ 7, 119–35.

Lead Plaintiff believes that subsequent revelations have confirmed the allegations in the Amended Complaint. On February 20, 2015, Retrophin disclosed that an internal investigation had confirmed the existence of (1) inappropriate stock transactions issued without shareholder

approval and in violation of Company policies and NASDAQ listing rules, and (2) millions of dollars of improper related-party transactions designed to personally benefit Shkreli, including consulting and settlement agreements that released Shkreli from liabilities previously incurred at MSMB. As a result, Retrophin's Form 10-Q for the third quarter of 2013, Form 10-K for 2013, and Forms 10-Q for the first three quarters of 2014 contained errors, and the financial statements in the 2013 Q3 Form 10-Q and the 2013 Form 10-K could no longer be relied upon. Compl. ¶ 142. In the same filing, Retrophin also disclosed that it was under criminal investigation by the U.S. Attorney for the Eastern District of New York concerning its dealings with Shkreli and MSMB. Compl. ¶¶ 16, 144.

Subsequently, on August 18, 2015, Retrophin filed a $65 million lawsuit against Shkreli, alleging that he had breached his duty of loyalty to Retrophin and misused Company funds. On December 17, 2015, Shkreli was indicted on charges of securities fraud and arrested.

## III.   PROCEDURAL HISTORY

Plaintiff Grachya Kazanchyan commenced this action on October 20, 2014 in the United States District Court for the Southern District of New York, naming Retrophin, Shkreli, Panoff, Richardson, Aselage, Golding, and Paley as defendants. On February 10, 2015, Grachya Kazanchyan was appointed Lead Plaintiff and Pomerantz LLP was appointed Lead Counsel.

Lead Plaintiff filed the Amended Complaint on March 3, 2015, and Defendants moved to dismiss. After Lead Plaintiff filed his opposition brief but before Defendants' deadline to file reply briefs, the parties agreed to participate in a mediation before Jed Melnick, Esq. of JAMS.

Although the initial mediation session on September 21, 2015 was unsuccessful, the parties subsequently made supplemental submissions to the mediator addressing key issues discussed during the mediation session. With the mediator's facilitation, the parties continued their negotiations. Ultimately, the parties reached an agreement to settle this action, which they me-

morialized in a Memorandum of Understanding ("MOU") on November 23, 2015 and then in the Stipulation on January 29, 2016.

Under the terms of the Settlement, Settling Defendants will cause $3,000,000 (the "Settlement Amount") to be paid into an escrow account maintained by Huntington National Bank. Lead Counsel believes that this immediate cash recovery provides a substantial benefit to the Class. Lead Counsel intends to request an award of up to 33% of the Settlement Fund in fees, up to $48,685.15 in expenses, and up to $3,500 as an award for Lead Plaintiff. The reasons for these requests will be set forth in the papers to be filed in advance of the Final Approval Hearing.

The proposed Notice informs Class Members of all these matters and affords an opportunity to request exclusion from the Class or object to the Settlement, Plan of Allocation, and/or the award of attorneys' fees and expenses. The Notice will be mailed to the address of each Class Member (as identified in Retrophin's transfer records), as well as to institutional investors and banks and brokerage firms that usually maintain custodial accounts. A Publication Notice will be published on a national business newswire. A copy of the Notice, Publication Notice, Proof of Claim Form, and Stipulation of Settlement will also be posted on a website maintained by the Claims Administrator.

## IV.    THE PROPOSED SETTLEMENT WARRANTS PRELIMINARY APPROVAL

At the Final Approval Hearing, the Court will have before it extensive papers submitted in support of approval of the proposed Settlement and will be asked to make a determination as to whether the Settlement is fair, reasonable and adequate under all of the circumstances surrounding the litigation of the Actions. At this juncture, however, the Parties request only that the Court grant preliminary approval of the Settlement.

### A.      Standards for Preliminary Approval

> A court may approve a class action settlement if it is fair, adequate, and reasonable, and not a product of collusion. A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement. A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery. We are mindful of the strong judicial policy in favor of settlements, particularly in the class action context. The compromise of complex litigation is encouraged by the courts and favored by public policy.

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005) (citations and internal quotation marks omitted). In evaluating a proposed class-action settlement, "courts should give proper deference to the private consensual decision of the parties" and should bear in mind "the unique ability of class and defense counsel to assess the potential risks and rewards of litigation." *Fleisher v. Phoenix Life Ins. Co.*, Nos. 11-cv-8405, 14-cv-8714, 2015 U.S. Dist. LEXIS 121574, *17 (S.D.N.Y. Sept. 9, 2015) (citations omitted). Moreover, the Supreme Court has cautioned that courts should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). This is particularly important in class actions and other complex cases where substantial resources can be conserved by avoiding the time, cost, and rigor of prolonged litigation.

The three-step process for approval of a class action settlement is: (1) preliminary approval; (2) dissemination of notice of the settlement to the class; and (3) a settlement approval hearing where class members may be heard regarding the fairness, adequacy, and reasonableness of the settlement. *Manual for Complex Litigation (Fourth)* §§ 21.632–.634 (2004). This procedure serves the dual function of safeguarding class members' procedural due process rights and enabling the court to fulfill its role as the guardian of the class members' interests. *See* William Rubenstein, Alba Conte, & Herbert B. Newberg, *Newberg on Class Actions* § 11.25 (4th ed.

2002). Lead Plaintiff respectfully requests the Court to take the first step in the process and grant preliminary approval to the Settlement.

**B.      The Proposed Settlement Merits Preliminary Approval**

"If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies, such as unduly preferential treatment of class representatives or of segments of the class, or excessive compensation for attorneys, and appears to fall within the range of possible approval, the court should direct that notice under Rule 23(e) be given to the class members of a formal fairness hearing, at which arguments and evidence may be presented in support of and in opposition to the settlement." *Manual for Complex Litigation (Third)* § 30.41 (1995).

Here, the proposed Settlement should be preliminarily approved. It is substantively fair because the settlement recovery falls within the range of possible approval. Assuming that each price decline following an alleged corrective disclosure was 100% attributable to the alleged misrepresentations, Plaintiffs' damages expert estimated that damages for the entire Class Period would be approximately $54.1 million for 22.3 million damaged shares. To recover this amount, however, Plaintiffs would need to prove that each stock price decline was caused by the revelation of fraud, rather than by other news or by normal volatility. Defendants argued that none of the price declines were statistically significant at a 95% confidence level. While Plaintiffs disagree that they are required to prove statistical significance, Plaintiffs may have been able to show statistical significance at a 95% confidence level for May 29, 2014 and September 17, 2014 by using a control period of October 14, 2014 through September 16, 2015, which Plaintiffs believe is the only available control period during which Retrophin's stock price was not affected by the alleged fraud. However, as detailed further below, the issue of the appropriate control period has been hotly contested between the parties, and there is no assurance that the Court would accept

8

Plaintiffs' model. Even if it did, damages based solely on these two disclosures are significantly lower, ranging between $26 million and $41 million, depending upon the trading model used.

Thus, the $3 million settlement is approximately 7–10% of the likely recoverable damages ($26–41 million) in this case. This recovery is well within the range of the historical values of settlements with the same range of estimated damages. For example, in securities class actions with less than $50 million in estimated damages, the median settlement in 2014 was for 9.9% of the estimated maximum recovery. *See* Cornerstone Research, *Securities Class Action Settlements: 2014 Review and Analysis* at 12 (2015), https://www.cornerstone.com/GetAttachment/ 701f936e-ab1d-425b-8304-8a3e063abae8/Securities-Class-Action-Settlements-2014-Review-and-Analysis.pdf; *Booth v. Strategic Realty Trust, Inc.*, No. 13-cv-04921-JST, 2015 U.S. Dist. LEXIS 140723, *17 (N.D. Cal. Oct. 15, 2015) (citing the Cornerstone report and approving a settlement for 20% of potential recovery); *see also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa. 2001) (citing studies indicating that the average securities-fraud class-action settlement since 1995 has resulted in a recovery of 5.5–6.2% of estimated losses). Courts routinely approve similar settlements. *See, e.g., In re Crazy Eddie Sec. Litig*, 824 F. Supp. 320, 323–24 (E.D.N.Y. 1993) (approving settlement for 10% of potential recovery); *see also City of Detroit v. Grinnell Corp*., 495 F.2d 448, 455 n.2 (2d Cir. 1974) ("In fact there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.").

The proposed Settlement is also procedurally fair because it is the product of arm's-length negotiations among counsel with extensive experience in securities class-action litigation. In addition, the parties negotiated with the assistance of an experienced mediator who recommended the $3,000,000 settlement amount. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d

Cir. 2001) ("[A] . . . mediator's involvement in . . . settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."). Lead Counsel had a thorough understanding of the action and of the strengths and weaknesses of the parties' respective positions, and has determined that the Settlement is fair, reasonable, adequate, and in the best interests of the Class. This conclusion was reached after considering the strengths and weaknesses of each side's respective positions (detailed herein), as well as considering issues that would have been left to the jury to decide in the event of a trial.

### C.    The Applicable Factors Support Preliminary Approval

Insofar as they are applicable at this stage, the Settlement also fares well in light of the applicable factors used in evaluating class-action settlements for final approval. These factors include: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). All nine factors need not be satisfied; rather, the Court should consider the totality of these factors in light of the particular circumstances. *Thompson v. Metro. Life Ins. Co.*, 216 F.R.D. 55, 61 (S.D.N.Y. 2003).

### 1.  Risks of Establishing Liability & Damages/Complexity, Expense, and Likely Duration of the Litigation

The risks of proving liability, loss causation, and damages were substantial. If the parties did not agree to settle, they would have faced an expensive litigation process—involving particularly extensive, time-consuming, and expensive expert discovery—with an uncertain outcome.

First, to obtain merits discovery, Plaintiffs would have to defeat Defendants' motions to dismiss, which had not yet been ruled upon at the time of settlement. *See* 15 U.S.C. § 77z-1(b) (under the PSLRA, discovery is stayed while a motion to dismiss is pending). To do so, Plaintiffs would have to establish that the Amended Complaint satisfies the strict pleading requirements of the PSLRA, in particular the requirement that its factual allegations give rise to an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 314 (2007).

Plaintiffs believe the Amended Complaint is well-grounded in facts strongly suggesting scienter. Specifically, the Amended Complaint alleges that Shkreli personally orchestrated the improper stock grants and directly benefitted from the undisclosed related party transactions, and that the remaining Defendants recklessly disregarded numerous red flags. Retrophin's allegations in its lawsuit against Shkreli provide further support for an inference of scienter. For example, in April 2013, Retrophin's Board received a draft consulting agreement with a clause broadly releasing the "consultant's" claims against Shkreli and MBMB. *See Complaint* ¶¶ 92, 108–13, 118–24*, Retrophin, Inc. v. Shkreli*, No. 15-cv-06451 (S.D.N.Y. Aug. 17, 2015). However, while Plaintiffs are confident they would have prevailed against Shkreli and Retrophin, there was no guarantee of prevailing against the other Settling Defendants.

If Plaintiffs defeated the motions to dismiss, the parties would have proceeded with protracted and expensive litigation.  Discovery would have been time-consuming and expensive,

and Plaintiffs would have faced significant obstacles in proving loss causation and damages at summary judgment and then trial. The parties fully vetted these issues at the mediation and in their supplemental submissions to the mediator thereafter.

Specifically, Defendants challenged loss causation, arguing that the corrective disclosures alleged in the Amended Complaint did not actually reveal corrective information to the market. Relatedly, Defendants also argued that none of the stock price declines following the alleged corrective disclosures had a statistically-significant price impact at a 95% confidence level, which they contend is a prerequisite for proof of damages. Moreover, the parties disputed which control period to use for determining statistical significance. Defendants contended that the Class Period should be the control period; Plaintiffs countered that the appropriate period should begin after the Class Period, when the stock was no longer tainted by the alleged fraud. Under Defendants' control period, none of the price declines were statistically significant at a 95% confidence level. Using Plaintiffs' control period, four declines were statistically significant: May 29, 2014 and September 17, 2014 at a 95% confidence level, and September 16, 2013 and October 8, 2014 at a nearly 90% confidence level. However, there is no assurance as to which control period and which level of statistical significance a court would accept, and regardless, the amount of recoverable damages could nonetheless be substantially limited. At best, navigating these issues would have involved extensive expert discovery, which would be expensive and complex.

### 2.    Stage of Proceedings and Amount of Discovery Completed

This factor is relatively neutral because the case settled before any discovery took place. Nonetheless, "[t]o approve a proposed settlement, the Court need not find that the parties have engaged in extensive discovery. Instead, it is enough for the parties to have engaged in sufficient investigation of the facts to enable the Court to 'intelligently make . . . an appraisal' of the Settlement." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 176 (S.D.N.Y.

2000) (citation omitted), *aff'd sub nom. D'Amato v. Deutsche Bank,* 236 F.3d 78 (2d Cir. 2001); *see also In re Rio Hair Naturalizer Prods. Liab. Litig.,* MDL No. 1055, 1996 WL 780512, at *13 (E.D. Mich. Dec. 20, 1996) ("There is no precise yardstick to measure the amount of litigation that the parties should conduct before settling.").

Here, in preparing the Amended Complaint, Plaintiffs undertook an extensive investigation of the underlying facts and circumstances, including interviewing possible witnesses. Moreover, in connection with the mediation, Plaintiffs worked closely with experts to analyze loss causation and damages extensively, particularly the issues raised by the Defendants. Lead Counsel evaluated numerous different potential damages scenarios for each alleged corrective disclosure. Thus, Lead Counsel had sufficient evidence to assess the potential risks and rewards of continued litigation.

### 3.    The Risks of Maintaining the Class Action through Trial

The parties settled before Plaintiffs moved for class certification. While Plaintiffs are confident that a class would have been certified, Defendants raised several arguments in mediation indicating that they would have vigorously opposed class certification.

Plaintiffs rely on two different presumptions of class-wide reliance. First, under the fraud-on-the-market theory, class-wide presumption can be presumed for securities trading on an efficient market because the market price of a security in an efficient market necessarily incorporates all publicly available information, including any material misrepresentations. Therefore, investors who buy or sell a security at market price are presumed to rely on any such misrepresentations. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2408 (2014) ("*Halliburton II*"). However, Defendants argued that Retrophin securities did not trade on an efficient market because they were highly volatile during the Class Period, and that the Over the Counter market was not efficient. Defendants further argued that, even if the market was efficient, none

of the alleged corrective disclosures had a statistically-significant price impact, rebutting any presumption of class-wide reliance. *See id.* at 2417 (allowing defendants to "defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock").

Second, under the *Affiliated Ute* presumption, "if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972)). However, this presumption applies only to claims "involving primarily a failure to disclose." *Affiliated Ute*, 406 U.S. at 153. Plaintiffs and Defendants disagree as to whether this case primarily involves misrepresentations or omissions, and caselaw provides mixed guidance. *Compare In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 48 (S.D.N.Y. 2013) (applying presumption where alleged disclosures were "truthful, as far as they go" but misleading in "what they do not say") *with Goodman v. Genworth Fin. Wealth Mgmt.*, 300 F.R.D. 90, 105 (E.D.N.Y. 2014) (refusing to apply presumption because the alleged omissions were only "significant because they contradicted the affirmative representations"). While Plaintiffs are confident that a class would have been certified, navigating these issues would have involved extensive expert discovery, which would be expensive and complex.

### 4.    Reasonableness of the Settlement

As noted above, the $3 million settlement is approximately 7–10% of the likely recoverable damages ($26–41 million) in this case. Plaintiffs respectfully submit that considering the risks of continued litigation and the time and expense that would be incurred to prosecute the action through a trial, the Settlement represents a substantial recovery that is in the best interests of the Class.

**V.      CERTIFICATION OF THE CLASS IS APPROPRIATE**

The Second Circuit has long acknowledged the propriety of certifying a class solely for settlement purposes. *See Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982). The parties have stipulated to the certification, for settlement purposes only, of the following Rule 23(b)(3) class:

> All persons who purchased or otherwise acquired Retrophin securities between June 13, 2013 and September 30, 2014, both dates inclusive. Excluded from the Class are Defendants, all current and former directors and officers of the Company during the Class Period, and any family member, trust, company, entity or affiliate controlled or owned by any of the excluded persons and entities referenced above. Also excluded from the Class are those Persons who request exclusion from the Class in such form and manner, and within such time, as the Court shall prescribe.

**A.      The Proposed Settlement Class Satisfies Rule 23(a)**

To be certified under Rule 23(b)(3), a proposed class must satisfy the four elements of Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation) and the two elements of Rule 23(b)(3) (predominance and superiority). Fed. R. Civ. P. 23(a), (b)(3). As is often the case in securities class actions, the four elements of Rule 23(a) are easily satisfied.

First, numerosity is satisfied. Courts generally assume that the numerosity requirement is met in cases involving nationally-traded securities. Indeed, "numerosity is presumed at a level of 40 members." *Consolidated Raid Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, Lead Counsel's damages expert estimates that 26 million shares of Retrophin common stock were damaged by Defendants' alleged misconduct during the Class Period. This suggests that there may be thousands of class members, and thus numerosity is easily satisfied.

Second, commonality is satisfied. The following questions of law and fact are common to the Class: (1) whether Defendants made false and misleading statements and/or omitted material facts concerning Retrophin's issuance of stock options without shareholder consent; (ii) whether

Defendants failed to disclose material facts concerning related-party transactions benefiting its CEO, (iii) whether Defendants acted knowingly or recklessly in issuing the alleged false and misleading statements; and (iv) whether the price of Retrophin securities during the Class Period were artificially inflated because of the alleged misconduct.

Third, Lead Plaintiff's claims are typical of the Class's claims. Lead Plaintiff's claims arise out of the same course of conduct, involve the same legal theories, do not raise divergent goals or interests, and are capable of class-wide resolution. There is no evidence that Lead Plaintiff stands in any different posture than, or has any conflicting position with, any other Class member. All Members of the Class were victims of this common course of conduct by Defendants. As a result, the claims of the Lead Plaintiff are typical of those of the Class.

Fourth, adequacy is satisfied. Courts have established a two-prong test for this requirement: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) whether the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class. *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 182 (S.D.N.Y. 2005). Both prongs are met here. Lead Plaintiff has the same claims as the members of the Class he seeks to represent, and neither Lead Plaintiff nor Lead Counsel have any conflicts of interest with other class members. Lead Counsel has successfully prosecuted numerous securities class actions on behalf of investors across the country and has successfully secured this Settlement for the proposed Class. Accordingly, the interests of the Class have been, and will be, fairly and adequately protected.

### B.     The Proposed Settlement Class Satisfies Rule 23(b)

Rule 23(b)(3) requires that issues common to the class predominate over individualized issues and that a class action be superior to other methods of adjudication. In evaluating these factors in the settlement context, the Court need not consider whether the action would present

intractable trial management problems because "the proposal is that there be no trial." *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997); *see also* Fed. R. Civ. P. 23(b)(3)(D).

As noted above, to satisfy predominance, Plaintiffs invoke two presumptions of class-wide reliance. The fraud-on-the-market presumption requires four elements: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II* at 2408 (citation omitted). These elements are met here: (1) Defendants allegedly made misrepresentations and omitted material facts in their SEC filings and public presentations; (2) the alleged misrepresentations and omissions concerned the non-disclosure of related-party transactions involving Retrophin's CEO, as well as the unauthorized grant of millions of shares of stock grants; (3) Retrophin securities traded on an efficient market; and (4) by definition, class members traded Retrophin securities during the Class Period.

The *Affiliated Ute* presumption has two elements: (1) "an omission of a material fact" (2) "by one with a duty to disclose." *Stoneridge,* 552 U.S. at 152. Here, Defendants had a duty to disclose related-party transactions under Item 404 of Regulation S-K, 17 C.F.R. § 229.404, yet failed to do so.

Superiority is easily satisfied as well. If not for a class action, each Class member would need to litigate the same factual and legal issues individually.

## VI.   THE PROPOSED FORM AND METHOD OF NOTICE IS APPROPRIATE

The parties have negotiated the form of a Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Expenses, and Settlement Fairness Hearing (the "Notice") to be disseminated to the Class to notify them of the terms of the Settlement and of their rights in connection therewith, as well as a Notice of Pendency and Settlement of Class Action (the "Publica-

tion Notice") to be published on a national business newswire.[5] The Notice and Publication No-

tice have been drafted to comply with the provisions of the Private Securities Litigation Reform

Act. *See* 15 U.S.C. §78u-4(a)(7).

The Notice will be sent by first-class mail to all Class members who can be identified

with reasonable effort to inform them of the terms of the Settlement, their rights in connection

with the Settlement, and the date of the Final Approval Hearing, where the Court will consider

final approval of the Settlement and attorneys' fees and expenses. The Claims Administrator will

make additional copies of the Notice available to nominee holders such as brokerage firms who

held Company stock during the Class Period. Such nominee holders will be requested to forward

copies of the Notice to all beneficial owners of such shares or, alternatively, to provide the

Claims Administrator with a list of the names and addresses of such beneficial owners so that the

Claims Administrator can mail the Notice to such beneficial owners directly.

The Parties believe that Notice by first-class mail, combined with Publication Notice in a

major publication and on the claims administrator's website, is the best notice practicable under

the circumstances, is typical of the notice given in other class actions, and satisfies the require-

ments of Rule 23 and due process. *See, e.g., In re Marsh Erisa Litig.*, 265 F.R.D. 128, 145

(S.D.N.Y. 2010); *see also Mangone v. First USA Bank*, 206 F.R.D. 222, 231-232 (S.D. Ill. 2001)

(approving mailed notice to last known addresses of a Settlement Class with nearly 18.5 million

members). Objecting parties can submit an objection in opposition to any aspect of the Settle-

ment and can appear at the Final Approval Hearing to present their arguments. This Court should

find that the Notice, Publication Notice, and the procedures for dissemination are reasonably cal-

culated to provide notice of the Settlement to the Class.

---

[5] The Notice, Publication Notice, and Proof of Claim are attached to the Walsh Declaration.

## VII.   PROPOSED SCHEDULE OF EVENTS

Plaintiffs propose the following schedule:

| | |
|---|---|
| Deadline for mailing Notice | Forty (40) calendar days after entry of Preliminary Approval Order |
| Deadline for papers in support of Settlement, Fee and Expense Award, and Compensatory Award | Twenty-one (21) calendar days before the Final Approval Hearing |
| Objection Deadline | Fourteen (14) calendar days before the Final Approval Hearing |
| Opt-Out Deadline | Fourteen (14) calendar days before the Final Approval Hearing |
| Deadline for responses to objections and other reply papers in support of Settlement | Seven (7) calendar days before the Final Approval Hearing |
| Final Approval Hearing | Within one hundred and twenty (120) calendar days after entry of Preliminary Approval Order |
| Deadline to file Proofs of Claim | Postmarked within five (5) calendar days after the Final Approval Hearing |

## VIII.   CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request the Court to preliminarily approve the proposed Settlement and enter a Preliminary Approval Order substantially in the form attached as Exhibit B to the Walsh Declaration.

Dated: January 29, 2016                    Respectfully submitted,

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Murielle J. Steven Walsh
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, NY 10016
*Attorneys for Lead Plaintiff*